**Johnny GUEITS, Petitioner,**

v.

**Robert KIRKPATRICK,
Superintendant,
Respondent.**

No. 06–CV–0849 (BMC)(JO).

United States District Court,
E.D. New York.

May 26, 2009.

New York State Attorney Generals Office, Queens County District Attorneys Office, Edward D. Saslaw, Kew Gardens, NY, for Defendant.

## ORDER ADOPTING REPORT AND RECOMMENDATION

COGAN, District Judge.

This case is before the Court on respondent's timely filed objections to the Report and Recommendation ("R & R") of the Hon. James Orenstein, which recommended granting the pending petition for a writ of habeas corpus and ordering the State of New York either to retry petitioner within 45 days or to release him. For the reasons set forth below, the R & R is adopted and the petition is granted.

▮ The facts of this matter are enumerated in Judge Orenstein's detailed R & R, which is attached and incorporated hereto. "If an objection is timely filed, as is the case here, the Court is bound to make a 'de novo determination of those portions of the report ... or recommendations to which objection is made.'" *Bohan v. Kuhlmann*, 234 F.Supp.2d 231, 242 (S.D.N.Y.2002) (*quoting* 28 U.S.C. § 636(b)(1); *citing United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997)); *see* Fed.R.Civ.P. 72(b).

Here, respondent primarily argues that Judge Orenstein failed to accord proper deference to the decisions of the New York courts in this matter.[1] Additionally, respondent objects to each portion of the R & R that found petitioner's trial counsel to be constitutionally ineffective. This Court has conducted a *de novo* review of the

Lynn W.L. Fahey, Appellate Advocates, New York, NY, for Petitioner.

1. The Court acknowledges respondent's argument that Judge Orenstein devoted a portion of the R & R "to a critique of the case presented by state prosecutors;" however, Judge Orenstein's detailed history merely serves as background and has no impact on the Court's holding that petitioner's trial counsel was constitutionally ineffective.

record in its entirety and adopts the R & R's findings and conclusions.

■ The vast majority of respondent's objections to the R & R focus on Judge Orenstein's alleged failure to defer to the prior decisions of New York courts in this matter. However, "when a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003) (internal citations and quotation marks omitted). As correctly concluded by the R & R, the Appellate Division's conclusory finding that petitioner received "meaningful representation" and rejection of petitioner's Sixth Amendment claim, *see People v. Gueits*, 10 A.D.3d 732, 732, 781 N.Y.S.2d 916 (2d Dep't), *leave to appeal denied*, 4 N.Y.3d 744, 790 N.Y.S.2d 657, 824 N.E.2d 58 (2004), on the record that petitioner presented, was an unreasonable application of *Strickland. See, e.g., Henry v. Poole*, 409 F.3d 48, 71 (2d Cir.2005).

It is therefore ORDERED that the petition for a writ of habeas corpus is granted, and it is further ORDERED that the State of New York shall either retry petitioner within 45 days or release him from custody.

**SO ORDERED.**

**REPORT AND RECOMMENDATION**

JAMES ORENSTEIN, United States Magistrate Judge.

On July 4, 2001, a badly injured woman was found in a park in Queens; she said that a single man had raped and beaten her. The police found petitioner Johnny Gueits ("Gueits") in the same park that morning and charged him with committing those two brutal crimes. However, DNA evidence later unequivocally proved that Gueits was not the rapist. The State of New York nevertheless pressed forward with its prosecution by dropping the rape charge, accusing Gueits of the assault, and improperly relying on inadmissible evidence to bolster its otherwise thin case. Gueits was convicted because his assigned attorney failed to prepare to offer the DNA evidence that would have negated the prosecution's case and repeatedly failed to take advantage of laws that would plainly have kept the prosecution from misusing the inadmissible evidence. The result is that Gueits has for years been incarcerated despite the failure to afford him his constitutional right to the effective assistance of counsel. Meanwhile, the State has done nothing to bring to justice the man whose DNA was found in the rape victim (and also in the victim of another reported rape), despite the fact that it had that man in custody when it learned of his connection to this case. Accordingly, for the reasons explained in detail below, I respectfully recommend that the court grant Johnny Gueits a writ of habeas corpus.

I. *Background*

Petitioner Gueits seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Docket Entry ("DE") 1 ("Petition"). Gueits asserts that he was denied the effective assistance of counsel at his trial on a charge of first-degree assault. Gueits was originally accused of, but never tried on, a separate charge of having raped the complainant, to whom I will refer only as the "Victim," on the same night as the assault of which he was convicted.[1] Brief-

---

1. The Victim's name is known to the parties

and appears on the record. Nevertheless, out

ly stated, Gueits claims that his counsel, Judah Maltz ("Maltz"), was ineffective because, among other lapses, he failed to secure the admission of evidence demonstrating that the Victim was attacked by another man who committed both the rape and the assault—a man whose description was consistent with an exculpatory statement Gueits made on the day of his arrest—and because he also failed to take advantage of his undisputed opportunities to prevent the jury from considering the sole evidence that unequivocally identified Gueits as the Victim's lone assailant.

The following recitation of the factual and procedural background relies to a large extent on the record developed at Gueits's trial. As explained below, however, I conclude that the trial was infected with serious legal error. Accordingly, while I have attempted to isolate from the record of that trial facts that appear to be undisputed, and to note those matters that are in dispute, I caution the reader at the outset that the trial record from which the following recitation is drawn should not be presumed to be either factually complete or accurate.

### A. Introduction

At approximately 5:30 in the morning on July 4, 2001, police officers responding to a 911 call discovered the Victim lying naked and badly injured in the Harvard Playground in Queens, New York. At the scene, the Victim told an emergency medical technician that she had also been raped, and that the same man who had beaten her had also committed the rape— an assertion she later repeated to a nurse at the hospital where she received treatment. Medical tests later confirmed the presence of semen in the Victim's vagina and anus.

Within moments of discovering the Victim, police officers found petitioner Gueits in another part of the playground. An officer noticed that Gueits had blood—later found to be that of the Victim—on his sneaker, but at trial testified either that she "didn't notice" or "[didn't] recall" whether Gueits had any blood anywhere else on his person or clothes. Trial Transcript dated April 2, 2002 ("TT") 506, 509, 510.[2] While the Victim was still at the scene awaiting transport to a hospital, an officer brought Gueits to her. Gueits was wearing handcuffs and surrounded by officers. An officer asked the Victim "do you know this man, is this the man that did this to you." WHT 10. The victim, who was drifting in and out of consciousness

of respect for her dignity and privacy, *see* 18 U.S.C. § 3771(a)(8), I will not use her name in this report. On a related matter, I have sought to ensure that the Victim is afforded her rights under the Crime Victims' Rights Act of 2004, including her right to be heard regarding Gueits's petition for release pursuant to a writ of habeas corpus. *See id.* § 3771(b)(2). Those efforts have been to no avail because the state authorities have lost track of the Victim. I direct the respondent to continue to make his best efforts to locate her and to provide her with a copy of this document.

2. I will use the following abbreviations in referring to the transcripts of various proceedings: "WHT" refers to the transcript of the *Wade* hearing held on November 28, 2001; "TT" refers to the consecutively numbered transcript pages for, respectively, proceedings on March 25–27 and the trial held on April 1–4, 2002 (as well as a second *Wade* hearing after the jury was selected but before the start of trial); "ST" refers to the transcript of sentencing proceedings on April 30, 2002; "ICT" refers to the transcript of proceedings at the initial conference before me on January 25, 2007; "ET" refers to the transcript of the evidentiary hearing before me on February 27, 2007 ("PX" refers to the petitioner's exhibits received in evidence at that hearing); and "AT" refers to the transcript of the parties' arguments before me on March 22, 2007.

with her eyes swollen shut as she lay in a stretcher, did not give a verbal answer but responded by "sh[aking] her head up and down." *Id.*

Gueits sought to explain the apparently incriminating circumstances. Less than four hours following his arrest, after being brought to the precinct and warned of his *Miranda* rights, Gueits agreed to be interrogated and then gave the arresting officer and another detective his version of the events. He said that after a night of drinking with a friend, he was sitting in the Harvard Playground when he saw the Victim (whom he had earlier seen at the sports bar where he and his friend were drinking), enter the park accompanied by a black male. Gueits said that the man attacked the woman, and that she then came running to Gueits for assistance but that he pushed her away (thus explaining the presence of the Victim's blood found on his sneaker).

The circumstances appeared to indicate that Gueits had raped and beaten the Victim and then, confronted with his crime (after inexplicably remaining at the scene for the police to arrive), had concocted a transparently false exculpatory statement about a mysterious—and conveniently absent—assailant of another race.[3] That is certainly how the State of New York approached the case: it charged Gueits as the sole person who committed both forcible rape and assault against the Victim. Later events, however, cast significant doubt on that initial view of the case.

An analysis of the semen found in the Victim—conducted after Gueits's arrest and statement but before his trial—excluded both Gueits and his drinking companion as the donor. Further evidence, also developed before Gueits's trial but never presented to the jury, revealed that the donor of the semen found in the Victim in this case had also provided the semen found in another rape victim in Maryland—a thirteen-year-old girl who had described her attacker, as Gueits had described the Victim's assailant in this case, as an African–American man.[4]

Nevertheless, the State did not abandon its prosecution of Gueits, either before his trial or in response to the instant petition. Instead, it shifted theories and tactics. Before Gueits's trial, the State dropped the rape charge, but it pressed its case against him solely on the assault charge and took the position that evidence about the identity of the Victim's apparent rapist was irrelevant. Later, faced with questions during these proceedings about the

3. There is no conclusive evidence in the record as to Gueits's race, though he is clearly not African–American. The arresting officer described Gueits as "HISP/WH" in her complaint report (*see* PX 7), and Gueits's habeas counsel described him as "white." Petition Ex. D ("Leave App.") at 2. Gueits's trial counsel testified at an evidentiary hearing on the instant petition that Gueits is of Hispanic ethnicity without making any mention of his race. ET 16.

4. Later still, during the instant habeas proceedings, Gueits's counsel did further investigation that revealed the identity of the semen donor in both rape cases as a man whom the State of New York had in its custody after Gueits was convicted, and who it later released on parole. As discussed below, by the time that Gueits's counsel learned these facts, New York's law enforcement authorities had known them for some 17 months. *See* Section II.A.3, *infra.* Because the man whose semen was found in two women who reported having been raped appears never to have been charged with either crime, I do not use his name in this report. I will use the phrase "apparent rapist" to refer to the man only as a convenient shorthand that fits the available facts (*i.e.*, the Victim's unequivocal statement that she was raped, and the results of the DNA analysis); I emphasize, however, that in doing so I of course make no judgment about whether the man so described can or should be charged with or convicted of any crime.

glaring potential that an innocent man is in custody while the identified apparent rapist remains free, the respondent's counsel continued to defend Gueits's conviction and made the remarkable assertion—for the first time in these proceedings—that the Victim may not, in fact, have been raped at all. In seeking to explain this new position, respondent's counsel argued that the Victim's explicit assertion that she had been "raped" was merely an equivocal statement that may instead have referred to a consensual encounter on the same night that she was brutally assaulted—a view apparently not shared by the trial prosecutor, who questioned the Victim on direct examination about "the guy that raped [her.]" TT 571.

The foregoing summary is provided to orient the reader to the issues in this case; and it is against that backdrop that I turn next to the specifics of the procedural history. In presenting this summary, I remain cognizant of the fact that the precise issue before the court is whether Gueits was denied the effective assistance of counsel, and whether, if so, the decision to the contrary by the state appellate court was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. In particular, I am aware that the issue for this court is decidedly not whether Gueits is guilty or innocent of the assault charge for which he is now in custody—regardless of whether the latter question is a matter that should nevertheless be of paramount importance to the State of New York.

B. *Pretrial Matters*

1. *The Rape And Assault Charges Against Gueits*

Immediately after arresting Gueits on the morning of July 4, 2001, police officers brought him to the local precinct and pre-pared charging documents. In a "Complaint Report" prepared that morning, New York City Police Officer Dorian Burrell ("Burrell") accused Gueits of rape in the first degree, by means of forcible compulsion, in violation of Section 130.35 of the New York Penal Law. PX 7. In the narrative section of her Complaint Report, Burrell wrote the following: "Victim stated that Perp assaulted he[r] and later at the hospital Victim stated that she was also raped by Perp. Victim told [a] nurse . . . at [the] hospital about the rape." *Id.* (capitalization removed). The Complaint Report also specified that the "Total N[umber] of Perpetrators" was one, identified Johnny Gueits as that sole "Perp" and indicated that no other perpetrator was "wanted" in connection with the crimes against the Victim. *Id.* With the sole assailant in custody, Burrell's Complaint Report understandably described the case as "closed." *Id.*

Consistent with that Complaint Report, Officer Burrell also swore out an accusatory instrument on July 4, 2001, that charged Gueits with four offenses: first-degree rape, first-degree assault, second-degree assault, and sexual abuse in the first degree. In the portion of the instrument describing the details of the crime, Burrell (referring to herself as the "deponent") attested to the following:

> Deponent states that at the above-mentioned date, time and place of occurrence she observed the complainant [Victim] standing in a public park naked and beaten about the head and face with one eye swollen shut and bleeding from the head. Deponent further states that when she asked the complainant if it was the Defendant, Johnny Gueits, "who did this" to her she nodded "yes[.]"

> Deponent further states that the complainant informed . . . a nurse at Mary Immaculate Hospital that the Defendant

also forced his penis into her vagina after beating her about the head and face with his fists and kicking her. The Deponent further states that upon arresting the Defendant who was sitting on a junglejim [sic] in the opposite side of the above location he had what appeared to be blood on his shoes, and was holding a shirt which also had what appeared to be blood on it.[5]

PX 6 (capitalization removed). It is thus apparent that from the outset of its case, the State took the position that the man who assaulted the Victim—that is, the person who committed the crime for which Gueits is now incarcerated—also raped her, and that he did so after he had begun beating her. As discussed below, each element of that position was entirely consistent with a statement that Gueits provided on the day of his arrest and with the available forensic evidence. However, once the DNA analysis excluded Gueits as the source of the samples recovered from the Victim, that position was entirely inconsistent with the theory that Gueits was the assailant.

### 2. Gueits's Statement

At around 9:00 a.m. on the morning of his arrest (after Officer Burrell had already described the case as "closed" in the Complaint Report completed at 8:30 a.m., compare WHT 51 with PX 7), Gueits was brought to an interview room to speak with Officer Burrell and New York City Police Detective Bernard Porter ("Porter"). WHT 51; TT 595. After voluntarily waiving his Miranda rights, Gueits made a statement, which Burrell recorded as follows:

[At 11:00 p.m.] he went to Acurio sports bar with Freddy. [At 1:30 a.m. he] left bar with Freddy. At [2:00 a.m. he] went with Freddy to [a] deli at 180 slash Hillside and got hero and beers, then went to back on 179 Place with Freddy. Female Hispanic entered park with male black. Female had been in sports bar. Male black attacked female. Female was naked and came running to perp for assistance. He pushed her away. Denies raping or assaulting victim in any way.

WHT 19; see also TT 600–01 (Porter's trial testimony).

### 3. DNA Evidence That Excluded Gueits And Implicated Another

At some point after arresting him, the police obtained from Gueits a sample of his DNA for testing purposes. TT 611 (Porter). That testing revealed that Gueits was not the source of the DNA in the semen taken from the Victim on the day of the crime. After receiving those results, the prosecutor dropped the rape charges against Gueits. TT 518; AT 49.

Information about the DNA found in the Victim was entered into a national database, and produced a match with another rape case in Maryland. Specifically, as Maryland police officials informed the prosecutor in this case—and as the prosecutor, in turn, informed Gueits's assigned counsel before trial—the DNA taken from the Victim matched the DNA found in a 13–year–old girl in Baltimore who reported having been raped by a "male black." See TT 3, 676–77.

---

**5.** Forensic examination of Gueits's apparel confirmed that the Victim's blood was on his right sneaker. Although the laboratory found what it presumed to be blood on Gueits's left sneaker and on his shirt, see PX 2, it apparently did not attempt to determine whether the substance found on those items was in fact human blood and, if so, whether it was the Victim's. The laboratory report also shows that no blood was found on Gueits's shorts or boxer shorts. Id.

### 4. Pretrial Court Proceedings

#### a. The First Wade Hearing

On November 28, 2001, the court held a *Wade* hearing that explored the procedures used to procure evidence that the prosecution characterized as an identification by the Victim of Gueits as her assailant. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). At the hearing, Officer Burrell testified that when she first encountered the Victim at the Harvard Playground, the latter was lying naked on the ground, unable to speak, and with her eyes swollen shut. WHT 6. After other officers, based on directions provided by the 911 dispatcher, found Gueits elsewhere in the park, they brought him over to where Burrell was waiting with the Victim, who was by that time lying on a stretcher awaiting transport to a hospital. Gueits was at that point handcuffed and surrounded by three officers. *See* WHT 70–71 (Gueits's testimony that he was handcuffed); WHT 42 (Burrell unable to recall whether Gueits was handcuffed at the show-up). Once Gueits was standing near the Victim's stretcher, Burrell questioned the Victim as follows:

Q. What did you say to [the Victim] when the defendant was brought right to her stretcher.

A. Um, do you know this man, is this the man that did this to you.

Q. What did she respond?

A. Um, she barely—she opened one eye and she shook her head up and down.

Q. In the affirmative?

A. Yes.

HT 10.[6]

After hearing the testimony and argument on the matter, the court ruled that "while show-ups are not preferable," the procedure used to procure the Victim's response to Officer Burrell's compound question did not violate Gueits's constitutional rights. WHT 85.

#### b. Discussions Regarding DNA Evidence And The Trial Schedule

On March 25, 2002, when the trial judge asked if the parties were ready to move the case to trial, the prosecution answered in the affirmative but Maltz did not, or at least not at first. TT 2. Instead, Maltz noted the "revelation" about the DNA evidence that not only excluded his client as the donor of the semen found in the Victim, but that also matched a suspect in the Baltimore case who was "on the loose." TT 2, 3–4. Maltz made clear that he found the information important because of his defense theory that "the same person that raped the victim was the same person who beat up this woman." TT 3.

After setting forth that background, Maltz articulated his problem: "My client has a number of options. For example, announcing not ready today, *giving the district attorney an opportunity to find*

---

**6.** As described further below, Burrell's later trial testimony did not include the first part of her compound question to the Victim ("do you know this man") and also omitted any reference to the fact that the Victim, whose eyes had to that point been swollen shut, "barely ... opened one eye" to view Gueits before making the head shake that Burrell interpreted to be an affirmative answer. Also omitted from Burrell's trial testimony was her testimony at the first *Wade* hearing that the Victim "couldn't speak at all" and that her only response to Burrell's questions before the show-up was "moaning and crying." WHT 6, 32. Maltz did not cross-examine Burrell at trial about any of these discrepancies or omissions, nor did he question her about the discrepancies between her account at the hearing and the statements in her Complaint Report to the effect that the Victim was standing when Burrell first saw her and that she "stated" that Gueits assaulted her.

*who this person is* who raped this [Victim], as well as the 13 year old girl in Maryland." TT 4 (emphasis added).[7] Maltz did not discuss the possibility of seeking to delay the trial so that he himself could conduct further investigation on his client's behalf—an omission consistent with his later testimony at the *Sparman* hearing described below, in which he conceded that he never considered doing anything more to develop evidence relating to the DNA donor than asking the prosecutor to make such work unnecessary.

When the trial judge opined that the DNA evidence might not be of any use to Gueits, and that most defendants would welcome the opportunity to sever evidence of a rape from a trial that would otherwise involve only allegations of assault, Maltz began to articulate that there was "[a]lso an issue of credibility[.]" *Id.* Before he could go on, however, the court cut off the discussion by asking, "The question is are you ready?" *Id.* Instead of pursuing the matter and seeking relief that would allow him to put the DNA evidence before the jury, Maltz threw the decision to his client:

> MR. MALTZ: Well, I just want to point out my client tells me he wants to go

forward with the trial, doesn't want any delays in the case.

THE COURT: You wish to proceed?

MR. MALTZ: Yes

THE COURT: Okay. It took awhile to be there.

MR. MALTZ: I want the record to be clear he is making that determination.

THE COURT: All right, you wish me to make an inquiry regarding this, okay?

Mr. Maltz indicated there may be other matters relating to an individual whose semen was recovered from the victim. However, you want to proceed with your case, the assault case at this time; is that correct? And that is your decision.

THE DEFENDANT: Right.

THE COURT: Okay, so you are ready. Mr. Maltz

MR. MALTZ: Yes, your Honor.

TT 5.[8]

Having ascertained that Maltz claimed to be ready for trial, the trial judge went on to make a comment (in the course of discussing an issue relating to the appropriate scope of cross-examination) that

7. There is no dispute that by this point Maltz had been provided with copies of reports from the Office of the Chief Medical Examiner for New York City ("CME") and the Maryland State Police Crime Laboratory that revealed a match between the DNA found in the Victim in this case and that found in another rape victim in Maryland. *See* PX 2. Both reports included detailed contact information for the detectives working each case, and the CME report included the same for the respective medical personnel responsible for generating the DNA profiles. Nor is there any dispute that Maltz learned from the prosecutor that the victim in the Baltimore case had described her assailant as a black man. *See* TT 676; ET 14–22.

8. Maltz's acquiescence to his client's purported preference to avoid further delay is not directly before this court, but it plainly relates

to the claim that Maltz was ineffective by failing to secure and offer the DNA evidence that would exclude Gueits as the Victim's assailant. The court's question to Maltz about whether he wished to proceed rather than seek an adjournment was one that Maltz had the duty to decide on his client's behalf, using his best professional judgment; it was not a matter he could merely pass along to Gueits and then defer to the latter's preference. *See People v. White*, 73 N.Y.2d 468, 541 N.Y.S.2d 749, 539 N.E.2d 577, 582–83 (1989) (reserving "fundamental" decisions to the client); *People v. Trepasso*, 197 A.D.2d 891, 602 N.Y.S.2d 291 (App.Div.1993) (decision to waive speedy trial is not fundamental, and therefore is within the lawyer's domain); *see also People v. Washington*, 5 Misc.3d 957, 785 N.Y.S.2d 885, 889 (N.Y.Co.2004) (same).

made clear his expectation that Maltz would advance a defense theory based on DNA evidence: "You have the DNA evidence of that, based upon the allegation of rape and the fact that semen had been recovered from the victim. Based upon that the scientific nature of that evidence I will permit you to put that defense forward before the jury." TT 12.

### c. The Second Wade Hearing

On April 1, 2002, after jury selection but before the start of the trial, the court conducted a second brief *Wade* hearing, this time on Gueits's motion to suppress the anticipated testimony of a prosecution witness named Sunnita Jagpal ("Jagpal"), whom the prosecutor had led the defense to believe would identify Gueits as the Victim's assailant. TT 245–67.[9]

The sole witness at the hearing was Officer Burrell. She testified that she and Officer Marsha Wilson ("Wilson") arrived at the Harvard Playground shortly after 5:30 in the morning on July 4, 2001, in response to a 911 caller's report of an assault in progress. She found the Victim lying naked, badly beaten, and groaning near the handball court. TT 246–48. When Burrell asked the dispatcher to seek more information from the 911 caller, she was told that the caller was still on the line and had said that the Victim's assailant was still in the playground, sitting on the jungle-gym. Burrell testified that it was *after* receiving this information that Officer Wilson went to the jungle gym and found Gueits, and that there were no officers already there with Gueits

when Wilson found him. TT 250–51 (direct examination); *see also* TT 259–62 (cross-examination). Upon finding Gueits, the officer brought him over to the Victim. TT 251.

Jagpal, the 911 caller, later testified that when the dispatcher asked for further information, she responded that the police were already taking to Gueits. TT 447, 449 (summarizing and quoting Jagpal's responses to prosecutor's leading questions in the grand jury).[10] The distinction was potentially significant: if Jagpal alerted the officers to Gueits's presence in the park (as Burrell testified), there could be no basis for claiming that the police had done anything suggestive in eliciting Jagpal's identification. On the other hand, if the police had the 911 dispatcher contact Jagpal—who was located in her home across the street and making observations of the playground from her window—only after locating Gueits, there might be a question as to the suggestiveness of the officers' actions. Indeed, that was precisely what Maltz sought to prove on his client's behalf. *See* TT 265 ("It is my contention that the two officers already surrounded my client at the time when [Jagpal identified Gueits]."). The court rejected that contention, and made a factual finding that "the viewing of the defendant by the eyewitness was not police arranged and clearly ... the police had no way of knowing that the 911 caller was looking out the window ...." TT 267. Nevertheless, after Jagpal's trial testimony revealed the inconsistency with Burrell's hearing testimony, Gueits's trial

---

**9.** As discussed below, Jagpal gave no such testimony, but instead stated that she had been unable to see the Victim's assailant clearly enough to identify him. TT 435–36, 448, 464, 467–70, 478.

**10.** More precisely, Jagpal confirmed at trial that she had made such a statement to the

grand jury. She also testified that the statement was untrue, and that she merely assumed that the person with the police was the same person that she had earlier seen kicking the Victim, but that she did not know if that was so because it had been too dark for her to identify the assailant. TT 447–48.

counsel did nothing to exploit it. He neither asked the court to revisit the issue of the identification procedures [11] nor even sought to highlight the inconsistency between Jagpal's trial testimony and Burrell's (which tracked her hearing testimony) for the benefit of the jury that had to assess the strength of the evidence.

### C. The Trial

#### 1. The State's Case

The prosecution presented eight witnesses, none of whom identified Gueits as the Victim's assailant. Only two of the eight were percipient witnesses to the assault itself—the Victim, and Jagpal. Both of those witnesses, when asked if they could identify the assailant in the courtroom, failed to identify Gueits. *See* TT 572, 620–21 (Victim), 478 (Jagpal). The remaining witnesses included Officers Burrell and Wilson, who responded to Jagpal's 911 call; an Emergency Medical Technician who recalled that the Victim said she had been raped and assaulted by the same man; the detective who recounted Gueits's exculpatory statement; a criminalist who (consistent with Gueits's statement) confirmed that the Victim's DNA was in the blood found on Gueits's sneaker; and a doctor who described the Victim's injuries. To the extent relevant to the instant petition, I describe the evidence in further detail below.

#### a. The Victim's Testimony

The Victim's testimony was uncertain in many details, and included some statements that tended to inculpate Gueits and others that tended to exculpate him. She testified that on the evening of July 3, 2001, she began drinking while still at home with her husband and three children. At around 11:00 p.m., after consuming more than ten beers, she went to a local bar to continue. TT 562–63.[12] After several more drinks at the bar, she got into a confrontation with another patron: a man at the bar grabbed her chest, and the Victim responded by biting the man's hand and hitting him in the face. She then left the bar, but the man she had just struck followed her outside and—saying, "She owes me one"—hit the Victim "very, very hard" on the head. The Victim testified that she was unable to remember anything about this man. TT 564–65.

Following this altercation, the Victim left the bar and joined other people: "I just like, I wasn't feeling well, you know, because I was drinking, so I guess I just kept going. Some other people went to take me or comfort me." TT 565. The Victim recalled that all of her new companions were male, that they had been in the bar before she left it, and that they continued drinking, but did not recall how many of them there were, where they went, or what she and her companions drank. She did recall going to the Harvard Playground, but not how she got there—although she speculated that her new companions had taken her there. TT 566–67 (direct examination); *see also* TT 581–83 (cross).

At that point in her direct testimony, the Victim stated that her next recollection was of being in the park and being beaten

---

11. The issue remained in controversy despite the fact that Jagpal did not actually identify Gueits in her trial testimony because, as discussed below, the court erroneously admitted, and then erroneously treated as evidence-in-chief, the grand jury testimony in which Jagpal identified Gueits as the Victim's assailant.

12. The Victim gave the name of the bar as "Aquario." TT 564. This appears to be consistent with Gueits's statement that he had seen the Victim while he was drinking at a bar the name of which Burrell rendered as "Acurio." *See* WHT 19.

and kicked, all over her body but mostly in the head. TT 567–68. In response to a single question about the number of her assailants, the Victim gave three different answers within a space of moments. First, she speculated that there "[m]ust have been more than one, at least three." Then—after being warned not to speculate—she immediately changed her answer to "[t]here was three." Finally, after the judge told her that if she could not recall the number she should say so, the Victim immediately changed her answer again, to "I don't remember." TT 568–69.[13] The only other facts the Victim recalled about her attack were that it "went on for a while" and that she heard someone say "loca," the Spanish word for "crazy." TT 569.[14]

The Victim's next recollection was finding herself near a tree, naked and unable to get up. She did not know how her clothes had been taken off, and she was unable to find them. TT 569–70. The next person she encountered was a female police officer, apparently Burrell. TT 571. The Victim described that encounter as follows:

Q. Do you remember what you told the police officer?

A. Yes. She asked me is that—is this the guy and I looked, I look and I said, "Yes, that's the guy."

Q. Did she have a guy with her?

A. Yes, she had somebody.

Q. When you say, "that's the guy," what did you mean?

A. She asked me is that the guy that hit me and I said "yes," and then she asked me and then I told her I got raped.

Q. Did you know if that was the guy who had raped you?

A. I don't know. I don't remember.

Q. Do you know if the guy that she had was the guy or one of the guys who had kicked you?

A. Yes, it was.

TT 571. Despite the fact that the Victim's testimony was at odds with Burrell's (who had said the Victim was unable to speak), and that it removed ambiguities in Burrell's account in a way entirely favorable to the prosecution's case (in that the Victim rendered Burrell's question as being specific to the assault but not the rape, and omitted the part of Burrell's question that simply asked if the Victim knew Gueits), Gueits's trial attorney neither confronted either witness with the discrepancy nor addressed it in his summation.

The Victim went on to give inconsistent testimony about her ability to recall and identify the person she had identified to

13. Although the Victim conceded she did not remember how many people attacked her, the prosecutor proceeded to ask questions predicated on an assumption of multiple assailants. See, e.g., TT 569 ("These people who were kicking you ... were they saying anything to you?"). The record does not disclose any fact that may have led the prosecutor to assume that there was more than one assailant; other than the inconsistency of the Victim's original description of one assailant with the viability of the State's theory—revised after DNA evidence disproved its original view of Gueits as the Victims' sole assailant—that Gueits committed the charged assault despite having not committed the rape. Nor does the record

contain any information that would satisfactorily explain why the first time the Victim speculated that there "[m]ust have been more than one" occurred only after the State was forced to drop the rape charge against Gueits.

14. The evidence before the jury included no evidence that Gueits speaks Spanish. To be sure, the record in this collateral proceeding suggests that Gueits may be Hispanic, but that does not demonstrate that he speaks Spanish, and would in any event not change the fact that the jury had no reason to speculate about his knowledge of that language.

Burrell. When first asked, "do you remember him now as you sit here?" the Victim answered unequivocally, "Yes I do." Based on that answer, the prosecutor asked the Victim to look around the courtroom and see if she saw the man she had seen in the playground. The Victim said she did not see him in the courtroom. TT 572. Not content with the answer (for the obvious reason that Gueits was in fact present in the courtroom), the prosecutor immediately tried again. This time, he got an answer more to his liking:

Q. Do you remember what he looks like now?

A. Do I remember what he looks like?

Q. Right now as you sit here?

A. No, I don't remember.

Q. All right. It is okay.

TT 572.[15]

When the prosecutor concluded his direct examination, neither the Victim's testimony nor any other evidence suggested a motive for Gueits to attack the Victim, nor did her testimony or any other proof before the jury undermine the proposition that, consistent with Gueits's statement, she had entered the Harvard Playground with an African–American man. On cross-examination, however, Maltz inexplicably filled those gaps in the prosecution's case.

In answer to his questions about whether she had encountered "a male black" at various locations during the evening, the Victim first agreed that she did "remem-ber meeting a male black inside Aquario bar" but then almost immediately denied it, saying that "I wasn't with no male black. There was no blacks. It was Spanish. They were Spanish." TT 578. Maltz went on to elicit that the Victim did not socialize with any "male black" on the night she was attacked and did not remember seeing anyone of that description in the playground. *Id.* Even more inexplicably, Maltz elicited that "Freddie" was the man the Victim had described as having hit her after she bit him, TT 579–81—testimony that could have supported an argument that Gueits, whose statement included an allusion to having been drinking with a friend named Freddie at the same bar as the Victim, had a motive to engage in a retaliatory attack on the Victim.

Continuing a cross-examination that shored up the prosecution's case rather than undermined it, Maltz asked the Victim—who by that point was clearly being more combative with him than she had been with the prosecutor, and whose answers often plainly appeared to take Maltz by surprise—whether she had told anyone that the man who had beaten her had also raped her. By the time he asked that question, he had already elicited from Emergency Medical Technician Philip Sawyer, a prosecution witness, that the Victim had stated, in the presence of Sawyer and several officers, that "the person who raped her also beat her." TT 405. Despite having already elicited that testimony, Maltz asked the Victim to confirm

---

**15.** Maltz's failure to object allowed the prosecutor's persistence to pay off. As discussed below, by eliciting this inexplicable reversal of the Victim's testimony—from an explicit assertion that she *did* remember the person presented to her at the crime scene (but did not see him in the courtroom) to an equally explicit assertion that she did *not* recall him—the prosecutor laid a foundation for the later admission of Officer Burrell's testimony that the person the Victim had identified at the scene was Gueits. *See* TT 613–25; N.Y.Crim. Proc. L. § 60.20. As in several other areas of legal inquiry at the trial, Maltz appeared not to understand the rule being applied. He made no effort to forestall Burrell's testimony by noting that the Victim had sworn under oath that she could indeed recall the person she had seen—a recollection that would have made Burrell's testimony inadmissible under state law. *See* N.Y.Crim. Proc. L. § 60.20.

the statement. She denied making it. Maltz went on to elicit that denial from the Victim in several different emphatic variations. TT 588–89. Maltz then went on to elicit from the Victim a denial of Gueits's version of events—namely, that she had gotten up from where she was being beaten, approached another man for help, and had then been dragged back by her assailant after the man she approached pushed her away. TT 590. Having thus undermined some of the critical elements of his client's defense, Maltz concluded his cross-examination. *Id.*

### b. The Testimony And Improper Impeachment Of Eyewitness Sunnita Jagpal

Jagpal's testimony was comprised of two distinct portions: the admissible statements about her then-current recollections of the events she saw take place in the Harvard Playground from the vantage point of her second-story apartment across the street, and the prosecution's improper impeachment of that testimony through the use of her earlier testimony to the grand jury. As discussed below, the former added nothing to the prosecution's case, but the latter was of critical importance to the outcome. I describe each portion of her testimony in turn below.

### i. Testimony Admissible As Evidence–In–Chief

Jagpal testified that after going out for an evening of dancing and drinking on July 3, 2001, she arrived home at an apartment building across from the Harvard Play-ground at around 4:00 a.m. on July 4, 2001. TT 428–29. As she approached her building, she noticed a woman and two men sitting on a park bench in the playground with their backs to her, but she could not recall the race or any other details of the two men. TT 430. She did not see anyone else in the playground at that time. TT 430–31. Approximately an hour later, Jagpal heard a woman cursing and screaming, looked out her second-story window onto the playground and saw the same three people in the playground that she had noticed before, but could not hear what they were saying. TT 431–32. Some time later, between 5:00 a.m. and 5:30 a.m., Jagpal again heard a woman screaming and again looked out her window. TT 432–33. This time she saw a naked woman on the ground near a handball court being kicked by an unidentified man wearing a t-shirt and jeans. TT 433–35. Jagpal testified that she saw only one man assaulting the naked woman,[16] but that she could not discern his race or otherwise identify him (beyond describing him as "a little tall") because the park was too dark. TT 434–36. However, Jagpal's testimony appeared to suggest, at least obliquely, that the Victim's assailant was one of the two men whom Jagpal had seen earlier. *See* TT 434 (agreeing that "the second male that [she] had seen earlier was gone by this time"). Jagpal watched the assailant attack the Victim for about two minutes and then called 911 and told the operator that "there [wa]s someone beating up on" a woman in the park. TT 444. When she returned to the window, the assailant

---

**16.** Jagpal testified that "there was someone ... kicking [and] hitting on her." TT 433. The prosecutor, obviously sensitive to the problem for his case arising from the fact that someone other than Gueits had raped the Victim, ignored Jagpal's unequivocal use of the singular and restated her testimony thusly: "And you said *they* were kicking and hit-ting on her?" TT 433 (emphasis added). When he went on to ask explicitly how many people Jagpal had seen hitting the Victim, she replied "it was only one person." TT 434. Still unwilling to accept his witness's testimony, the prosecutor asked whether "there [was] a time that you initially saw two" only to be told that there was not. TT 434.

was no longer where she had seen him. TT 446.[17]

### ii. *Inadmissible Impeachment Testimony*

Jagpal's testimony had thus far done nothing either to prove or disprove the State's position that Gueits was the man who had assaulted the Victim. She had testified that she had seen one man assault a woman, but that she was unable to identify him or to say that the assailant was the same man sitting in the playground to whom she directed the police. Nevertheless, the prosecutor sought to impeach Jagpal with her previous testimony to the grand jury pursuant to a statute that authorizes a party to impeach its own witness with the witness' previous statements if that witness gives testimony at trial about a "material issue" that "tends to disprove" the position of the impeaching party. N.Y.Crim. Proc. Law § 60.35.

As the following narrative demonstrates, Maltz unsuccessfully objected to the improper introduction of Jagpal's grand jury testimony. The error was of course initiated by the prosecutor who improperly sought to introduce the evidence, and completed by the judge who improperly admitted it in contravention of the statute's text. But a critical step in the error—and one that effective counsel could and should easily have avoided—was Maltz's failure to point out to the court the statutory provisions that the court had omitted in citing the relevant rule of admissibility, and to explain to the court the disconnect between the facts on which the prosecutor relied and the correct reason those facts made the impeachment inadmissible.

The matter first came up when Jagpal testified that she saw the assailant kick the Victim a "[c]ouple of times." TT 436. When the prosecutor asked Jagpal to define that phrase, she said, "A few times, like 4 or 5 times." Not satisfied with the description of the number of kicks—or more plausibly, not satisfied that immediately before that answer, Jagpal had testified that she could not describe the assailant or identify his race, TT 435-36—the prosecutor did not try to impeach the testimony, but rather to lead the witness into a more favorable answer. After eliciting that she had testified in the grand jury, possibly on the same question, the prosecutor asked, "Do you remember you saw her kicked about 7 or—" but was cut off by an objection. The court sustained the objection. TT 437. The prosecutor then took another improper step, but one that Maltz and the court failed to catch: instead of trying to elicit Jagpal's failure to recall the number of kicks she had seen, he elicited her failure to recall how she had described that number when she testified in the grand jury. He then had her look at the grand jury transcript and asked whether it refreshed her memory "as to how many times the person kicked her"—a matter she had thus far not expressed any inability to recall. TT 437. Nevertheless, Jagpal answered without objection, and said that she "wasn't sitting there counting." She added, "I'm not too sure, a few times, you know, couple of times." *Id.*

Having improperly confronted Jagpal with her grand jury testimony on a nonmaterial issue, the prosecutor then continued in an apparent attempt to impeach his own witness. TT 437 ("In the grand jury did you try your best to tell the truth?"). Maltz properly objected and the court convened a sidebar conference. The trial

---

17. Jagpal gave the testimony described in the preceding two sentences after the court permitted the prosecutor to elicit statements from her grand jury testimony, as described below.

judge immediately invoked what he described as the relevant rule of law. In doing so, however, the trial judge initially did not accurately quote the statute, and omitted critically important provisions that rendered the proposed impeachment material inadmissible:

> THE COURT: For the record, in order to avoid errors from the jury I'm going to direct counsel's attention to the section which relates to when grand jury testimony may be used. "Sworn testimony including grand jury testimony may be used when a witness called by a party gives a prior contradictory statement." Are you familiar with the statement?

TT 438.

In initially describing the standard of admissibility as requiring only "a prior contradictory statement," the court erroneously omitted three important statutory requirements. First, the prior statement must concern "a material issue" in the case. N.Y.Crim. Proc. Law § 60.35(1). Second, the prior statement must be offered only for purposes of impeachment, and not as evidence-in-chief. *Id.*

§ 60.35(2). Third, and most immediately relevant to the sidebar conference (the inadmissibility of Jagpal's grand jury testimony as evidence-in-chief became relevant only later), a prior statement offered under the statute must not merely contradict the witness's trial testimony, but must also affirmatively "tend to disprove the position of the party who called" the witness. *Id.* § 60.35(3).[18] Maltz never invoked the latter requirement in opposition to the use of Jagpal's grand jury testimony, despite the fact that it was a complete bar to admission. *See id.* (testimony that "does not tend to disprove the position of the party who called [the witness] . . . is not admissible" under the statute).

Instead, in response to the prosecutor's statutorily insufficient insistence that "I believe I have a witness here who is contradicting her grand jury testimony[,]" TT 438, Maltz made two arguments that diverted the court's attention away from the issues critical to admissibility. First, he noted that the prosecutor had asked leading questions in the grand jury—a point the court promptly recognized as being legally inconsequential.[19] TT 439. Sec-

---

**18.** The statute reads in full as follows:

1. When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon *a material issue* of the case which *tends to disprove the position of such party*, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.

2. Evidence concerning a prior contradictory statement introduced pursuant to subdivision one *may be received only for the purpose of impeaching the credibility of the witness* with respect to his testimony upon the subject, *and does not constitute evidence in chief.* Upon receiving such evidence at a jury trial, the court must so instruct the jury.

3. When a witness has made a prior signed or sworn statement contradictory to

his testimony in a criminal proceeding upon a material issue of the case, *but his testimony does not tend to disprove the position of the party who called him* and elicited such testimony, *evidence that the witness made such prior statement is not admissible,* and such party may not use such prior statement for the purpose of refreshing the recollection of the witness in a manner that discloses its contents to the trier of the facts.

N.Y.Crim. Proc. Law § 60.35 (emphasis added). Although the court later described the statute more accurately, as set forth below, Maltz did not appreciate the correction and continued to argue the evidentiary issue with an apparently incomplete understanding of its requirements.

**19.** As will become clear, although Maltz's objection had no direct bearing on the admissibility of Jagpal's grand jury testimony, it did

ond, Maltz argued that Jagpal's grand jury testimony did not contradict her trial testimony. After summarizing her trial testimony thus far, Maltz asserted that all of it was "consistent" and argued that it was therefore improper for the prosecutor to elicit "that she saw or heard 7 to ten times kicking[.]" TT 440.

At that point, the sidebar conference took a turn that both expanded the scope of the dispute and compounded Maltz's ineffective performance. The court—saying that Maltz's point about consistency "is not what is material"—read practically *verbatim* the first subsection of Section 60.35, explicitly including both the requirement of materiality and the requirement that the proffered inconsistent statement tend to disprove the sponsoring party's "position." TT 440. Maltz, however, did not note the missing element; instead, he broadened his argument about consistency: "I don't think there is any contradiction to her testimony." TT 440. That response prompted a colloquy about the differences between Jagpal's trial testimony and grand jury testimony that went well beyond the number of kicks she had seen.

> THE COURT: Well, correct me if I'm wrong, my understanding in the grand jury is that the witness identified this defendant as being the person who was kicking the victim; is that correct?
>
> MR. FERINO [prosecutor]: What she said is that the same person she saw doing the kicking and beating was the same person that went over and sat on the bench and that she told the 911

operator that the police were talking to that same person at the bench as she was watching him.

> THE COURT: Okay, the 911, that is not—
>
> MR. FERINO: That is her testimony in the grand jury.
>
> THE COURT: In the grand jury?
>
> MR. FERINO: Oh, yeah.
>
> THE COURT: If she now gives testimony, she doesn't know whatever, can't see, that is material testimony which tends to disprove the People's position of the party, that the defendant was the person. So if that is what is transpired, you may then read the grand jury testimony.

TT 440–41.

During this part of the colloquy the trial judge erroneously characterized Jagpal's inability to recall certain matters as an affirmative contradiction of *both* her own prior testimony in the grand jury that identified Gueits as the assailant and the prosecution's "position" that Gueits had assaulted the Victim. In fact, Jagpal's trial testimony up to that point had contradicted neither. First, because Jagpal's inability to recall certain things at trial was not factually inconsistent with her ability to recall the same matters when testifying to the grand jury, she had not contradicted herself; at most, her inability to recall would have permitted the prosecutor to attempt to refresh her recollection by showing the grand jury testimony to her (a tactic that, when attempted, provided no additional incriminating evidence). Sec-

---

point to a fact of enormous practical significance. After the court erroneously admitted the grand jury testimony (an error later compounded by its failing to give a promised instruction limiting the jury's use of that evidence to impeachment purposes), the trial jury heard portions of Jagpal's grand jury testimony in which she repeatedly answered

in the affirmative to questions in which the prosecutor explicitly assumed that the Victim's assailant had been "John Gueits." *See* TT 445, 449, 476–77. That inadmissible impeachment testimony was the only evidence ever placed before the jury that directly identified Gueits as the man who assaulted the Victim.

ond, because Jagpal's trial testimony was merely that she was unable to identify Gueits as the assailant—rather than an affirmative statement that exonerated him—it did not tend to disprove the prosecutor's position; it was therefore plainly inadmissible under Section 60.35(3). *See, e.g., People v. Fitzpatrick,* 40 N.Y.2d 44, 51, 386 N.Y.S.2d 28, 351 N.E.2d 675 (1976) ("[Section] 60.35 manifestly permits impeachment only when the testimony of the witness in court [a]ffirmatively damages the case of the party calling him."); *id.* at 52, 386 N.Y.S.2d 28, 351 N.E.2d 675 (a witness's testimony that simply states that he cannot recall the events in question does not tend to disprove the prosecution's case to such an extent that impeachment may be allowed); *People v. Brazzeal,* 172 A.D.2d 757, 759, 569 N.Y.S.2d 746 (1991) (witness's trial testimony that he did not see who shot the victim did not tend to disprove the people's case that the defendant was the perpetrator); *People v. Comer,* 146 A.D.2d 794, 795, 537 N.Y.S.2d 272 (1989) (same).

Maltz apparently grasped none of this. Indeed, his response to the court's ruling demonstrated that he neither appreciated the scope of the ruling nor its rationale. After the trial judge made the ruling quoted above, he told Maltz, "You have an exception." Maltz proceeded to grasp at such straws as whether Jagpal qualified as a hostile witness or whether the prosecutor's tactics constituted improper bolstering, thereby driving the colloquy even further from the critical misstep in the court's analysis of the evidentiary issue under Section 60.35:

MR. MALTZ: The entire grand jury testimony?

THE COURT: Only those as I indicated.

MR. MALTZ: You mean hostile witness?

THE COURT: This is under the statute where somebody gives oral or written statements. Hostile witness is where the witness curses at the attorney or there is a hostile way to—this is not what we are doing. This is under the statute.

MR. MALTZ: I would object. I don't think there is sufficient foundation that has been laid by the district attorney to show the witness is reluctant or—

THE COURT: Nothing to do with what I said. Not an issue. If she now materially changes her testimony and does not testify that as she did in the grand jury that the defendant was the person who she saw kicking, then she said she doesn't know, that is a material issue in the case and on that issue the grand jury testimony may be read, pursuant to the section.

You could ask the witness if she could identify the defendant as the person she saw kicking the victim, as she did in the grand jury. Now, if she doesn't, changes her testimony in the—if she changes her testimony to say that she doesn't know who did it, or things of that nature, then that would permit you to read the grand jury testimony in.

MR. MALTZ: I would object.

THE COURT: Exception is noted.

MR. MALTZ: You are saying the D.A. has a right to ask the witness as she identified in the grand jury. That is bolstering.

THE COURT: She is sitting in the courtroom. He could ask her now, can you tell us if this is the person?

MR. MALTZ: As you did already in the grand jury. I think that is proper.

THE COURT: Mr. Maltz, please, he asked to lay a proper foundation, which I just told him. If the foundation is laid and she's now going to denounce her

testimony, the statute comes into play. Let's see what she says.

MR. MALTZ: Exception.

THE COURT: Noted.

TT 441–43.

Although the court ended the colloquy by stating that the prosecutor still had to lay a foundation to secure the admission of Jagpal's grand jury testimony—and in particular that Jagpal would have to "denounce her testimony" for it to be presented to the jury—it nevertheless permitted the prosecutor to read Jagpal's grand jury testimony to the jury without any such denunciation. Instead, immediately after the end of the sidebar conference, the reporter read back the question fragment that had sparked it ("Do you remember you saw her kicked about 7 or-"), and Jagpal answered in the *affirmative*. TT 443.

The prosecutor then asked Jagpal, "do you know someone named Johnny Gueits." Jagpal answered, "No." Although that response contradicted testimony she had given in the grand jury, it did not tend to disprove the prosecution's position that Gueits had committed the assault. Nevertheless, the prosecutor immediately impeached Jagpal with her earlier contrary answer—without any objection from Maltz. TT 443.

After next eliciting Jagpal's testimony about her 911 call, the prosecutor asked whether the assailant "came back and kicked [the Victim] again." When Jagpal answered that she was not sure—a response that again did not tend to disprove the prosecution's position—the prosecutor presented Jagpal's grand jury testimony answering the question in the affirmative. TT 445.[20] After confirming her recollection of that earlier testimony, Jagpal explained the discrepancy in a way that still failed to disprove the prosecution's position: "The person was kicking her and then I went and I called 911. When I . . . came back to the window the person wasn't there." TT 446.

The prosecutor then elicited the fact that in her grand jury testimony, Jagpal had said that the same person who had kicked the Victim was the person—Gueits—whom she later saw with the police officers who responded to her 911 call. Jagpal confirmed that she had given such testimony but denied that it was true. TT 448–49.[21] Even then, however, her testimony did not satisfy the requirements of Section 60.35 because it still failed to tend to disprove the prosecution's position that the man the police found in the park was the Victim's assailant: Jagpal explained that her testimony in that regard was untrue because she was unable to see the assailant well enough to know that it was the same man she later saw in the officers' company. TT 448 ("I don't know if it was the person that was kicking on her because it was dark. There was no lights in

---

20. Maltz objected in vain to "this procedure" but again failed to cite the pertinent legal rule. *Id.*

21. In light of the witnesses' differing recollections of the sequence of events surrounding Jagpal's 911 call and the officers' discovery of Gueits in the playground, as well as Jagpal's inability to identify Gueits at trial and the leading questioning that produced such an identification in her grand jury testimony, the recording of Jagpal's 911 call would plainly have been important evidence. The prosecution, however, did not preserve or disclose the tape of that call. TT 19. Maltz mentioned that fact in his summation, TT 696, but did not explain to the jurors that as a result of that lapse they were free to assume that the tape would undermine the prosecution's case. Nor did he explain the significance of the missing tape to such critical issues as Jagpal's identification or to the credibility of the officers' testimony.

the back of the handball court, but I saw the male was sitting by the swings.").

Thus, the tension between Jagpal's trial testimony and her statements to the grand jury implicated only the extent of her knowledge; at no point in her trial testimony did she say that Gueits was *not* the assailant. Indeed, after going over the same ground (including a repetition of the same inadmissible grand jury testimony),[22] Jagpal ended her testimony with a clear statement that she could neither help prove nor disprove the prosecution's case. TT 477–78 (agreeing that she was "not certain the person [whom she] identified in the jungle gym was the same person who did the kicking:); TT 478 (agreeing that she "didn't see Mr. John Gueits kick anybody" and adding "I don't know who the person was" aside from the fact that "[i]t was a male.").

After the conclusion of Jagpal's testimony, the court called a recess. When the trial reconvened, but before the jury returned to the courtroom, the trial judge sought to "complete the record" by explaining why the jury had been allowed to hear Jagpal's grand jury testimony:

> THE COURT: ... [T]he Court permitted the district attorney to use grand jury minutes during the course of the testimony of the last witness pursuant to C.P.L. section 60 point 35. It is my understanding or belief that it was the People's position at trial that as stated

in the People's opening and as reflected in the grand jury minutes that the eyewitness, Sunnita Jagpal, observed the incident from her window, observed the defendant kicking the complainant and therefore, identified him as being the perpetrator of the crime.

> The testimony at trial, which essentially was that she doesn't know who kicked the victim, didn't see what happened, tended to disprove the People's position as stated in their opening and as reflected in the grand jury minutes. Based upon that the Court found this was a material departure from her prior testimony and pursuant to the section I did permit the district attorney's use of the grand jury minutes.

TT 478–79. Moments later, the court reiterated its belief that it had "followed the dictates of the statute." TT 480.

The trial court's assertion—with which Maltz never expressed any disagreement, or indeed even any understanding of the issue—that the "position" element of Section 60.35 could be satisfied by showing that the prosecution had expected to prove its case specifically through Jagpal is contrary to the settled law of New York. The relevant "position" at issue here was the prosecution's contention that Gueits committed the assault; that "position" could not be undermined by a witness who said no more than she did not know whether that was the case.[23]

---

**22.** Maltz made several objections to the repeated uses of the grand jury testimony. In most cases, he simply said the word, "Objection" (or its equivalent, "I'm going to object"), without further explanation—a procedure that, as discussed below, is ineffective to preserve the objection for appellate review. TT 445, 447, 449. At other times Maltz made no objection at all. TT 445, 446, 449. Even when he did object, Maltz never identified or presented to the trial judge the reason the grand jury testimony was inadmissible.

**23.** *See, e.g., People v. Fitzpatrick,* 40 N.Y.2d 44, 52, 386 N.Y.S.2d 28, 351 N.E.2d 675 (1976); *People v. Rodwell,* 246 A.D.2d 916, 667 N.Y.S.2d 839, 841 (App.Div.1998); *People v. Smith,* 190 A.D.2d 1022, 593 N.Y.S.2d 645, 646 (App.Div.1993), *leave to appeal denied,* 81 N.Y.2d 976, 598 N.Y.S.2d 778, 615 N.E.2d 235 (1993); *Brazzeal,* 172 A.D.2d at 759, 569 N.Y.S.2d 746; *People v. Hickman,* 148 A.D.2d 937, 539 N.Y.S.2d 176, 176–77 (App.Div. 1989), *aff'd* 75 N.Y.2d 891, 554 N.Y.S.2d 474, 553 N.E.2d 1022, (Ct.App.1990); *People v.*

The court's claim to have followed the dictates of the statute was incorrect in another important respect as well: the statute provides for the admission of impeachment evidence only, not evidence-in-chief. N.Y.Crim. Proc. Law § 60.35(2). Nevertheless, while the prosecutor elicited Jagpal's grand jury testimony, Maltz never requested a limiting instruction and the court never gave one. Nor did Maltz request or receive such a limiting instruction at the end of the case. As far as the jury was ever told, it was completely free to consider the impeachment evidence admitted during Jagpal's testimony as evidence-in-chief. That impeachment evidence—which the respondent now concedes could not properly be considered as evidence-in-chief, see ICT 8–9; AT 42—was the only evidence that directly identified Gueits as the man who assaulted the Victim.

c. *The Remainder Of The Prosecution's Case*

As noted above, the Victim and Jagpal were the prosecution's only percipient witnesses. The remainder of the prosecution's case came from Officers Burrell and Wilson, who described the events at the Harvard Playground following their arrival and their communications with the Victim and Gueits; Emergency Medical Technician ("EMT") Sawyer, who described the Victim's condition at the scene and as she was taken to the hospital for treatment;

Detective Porter, who recounted Gueits's statement on the day of his arrest (which the prosecutor later characterized as a false exculpatory statement despite knowledge that it was corroborated by facts not presented to the jury); criminalist Meredith Rosenberg, who reported on the analysis of the blood found on Gueits's sneaker; and Dr. Richard Chang, who described the extent of the Victim's injuries. I summarize that evidence below.

i. *Officers Burrell and Wilson*

Officers Burrell and Wilson testified that they were on motor patrol at 5:30 in the morning on July 4, 2001, when they received instructions to investigate an assault in progress at the Harvard Playground. The officers arrived at the park a few minutes later. They did not see anyone at first. Burrell used her flashlight to search, and after a minute or two, the officers spotted the Victim lying naked and badly bruised near the playground's handball court. TT 298–301, 357, 483–88.[24] The Victim was unresponsive when Burrell tried to talk to her, and unable to provide a recognizable answer when Wilson asked for her name. TT 301–02, 489.

After a further radio communication, Wilson went toward the playground's jungle-gym and returned with Gueits. TT 303, 489–90. Gueits was wearing sneakers

*Garrett*, 147 A.D.2d 905, 537 N.Y.S.2d 379, 379 (App.Div.1989), *appeal denied*, 74 N.Y.2d 664, 543 N.Y.S.2d 406, 541 N.E.2d 435 (Ct. App.1989); *Comer*, 146 A.D.2d at 795, 537 N.Y.S.2d 272; *People v. Sampson*, 145 A.D.2d 910, 536 N.Y.S.2d 291, 293 (App.Div.1988), *appeal denied*, 73 N.Y.2d 982, 540 N.Y.S.2d 1016, 538 N.E.2d 368 (Ct.App.1989); *People v. Johnson*, 108 A.D.2d 1059, 485 N.Y.S.2d 627, 629 (App.Div.1985); *People v. Gilbert*, 99 A.D.2d 657, 472 N.Y.S.2d 232, 233 (App.Div. 1984); *People v. Burke*, 96 A.D.2d 971, 466 N.Y.S.2d 867, 869 (App.Div.1983), *aff'd*, 62 N.Y.2d 860, 477 N.Y.S.2d 618, 466 N.E.2d

158 (Ct.App.1984); *People v. Winant*, 179 Misc.2d 357, 684 N.Y.S.2d 836, 837–38 (Sup. Ct.1998). All of the cited cases were decided before Gueits's trial.

24. The fact that Burrell did not see the Victim when she entered the playground, and only spotted her after a minute of searching with the flashlight, tends to support the version of events to which Jagpal testified at trial: namely, that from her apartment across the street, she was unable to identify the Victim's assailant in the unlighted playground.

and had his shirt off and slung over his shoulder. Burrell described Gueits's white sneakers as being "filled with blood" (which she later toned down, after being shown a photograph of the shoes, to the less sensational assertion that there was blood on the "[u]pper part of the sneakers and on the laces"), but she testified that she did not notice whether there was blood under Gueits's sneakers, inside the sneakers, or on Gueits's hands, feet or any other portion of Gueits's person or clothing. *See* TT 304, 330, 363–66. Wilson similarly testified about seeing blood on Gueits's shoes but said she could not recall or did not look for or notice blood in other areas. TT 491–92, 506, 509–11.[25] The officers brought Gueits to the Victim and Burrell

asked her if Gueits "was the person who did this to her." TT 626. The victim responded by "shaking her head up and down." *Id.* The court prohibited the prosecutor from eliciting Burrell's testimony as to whether she understood the Victim's head-shake to convey an affirmative response to her question. *Id.*

Burrell's testimony about the latter show-up procedure (admitted when she was recalled after the Victim testified) was the only evidence, aside from Jagpal's improperly admitted grand jury testimony, that arguably directly implicated Gueits[26] —and as with Jagpal's inculpatory statement, its admission was due in large part to Maltz's failure to preserve his ability to make a valid statutory objection. The trial

---

**25.** The extent to which the officers did and did not notice or recall details about Gueits's appearance proved quite expedient for the prosecution, as did Maltz's failure to confront the officers with the evolution of that testimony over time. At trial, the officers testified that they did happen to notice blood on Gueits's right sneaker—an observation that meshed nicely with the later laboratory report confirming the presence of the Victim's blood on that item alone. Had they also noticed that Gueits was not otherwise spattered with blood, their testimony would have supported Gueits's defense. For good or ill, the credibility of the officers' testimony in this regard is not before the court. However, the issue of Maltz's effectiveness is, and in this regard, I note that he failed to confront Burrell with the subtle change of testimony between the first *Wade* hearing and the trial. At the former, Burrell had provided the following testimony:

> Q. ... Do you know if he had blood on his hands?
> A. I didn't see any blood on his hand.
> ...
> Q. Did you see any scratches or bruises on his shoulder?
> A. Um, I don't recall. I think he might have had a scratch somewhere and I don't know if you have a picture of that.
> Q. Did you pay attention to that scratch?
> A. Yes, I am not quite sure if we have a picture of that.

> ...
> Q. Do you know if you saw any blood on his shoulder?
> A. I didn't see any blood on the shoulder.

HT 45. It is of course possible that a jury could conclude that there was no substantive difference between the fact that Burrell didn't "see" blood elsewhere on Gueits—despite agreeing that she did "pay attention to [a] scratch" on his body—and her later, more prosecution-friendly testimony about failing to "notice." It is less likely that effective counsel would have chosen to ignore the difference rather than to cross-examine her about it, particularly given the importance of the issue to the theory of Gueits's defense.

**26.** The prosecutor understandably hoped the jury would infer from Burrell's testimony that the Victim—who was drifting in and out of consciousness when Gueits was presented to her and had one eye swollen shut—had understood Burrell's question and intended to answer it in the affirmative by shaking her head up and down. His attempt to have a witness say so explicitly, however, was unsuccessful: the court prohibited the prosecutor from eliciting Burrell's testimony as to whether she understood the Victim's head-shake to have such a meaning. TT 626. Whether for that reason or some other—such as the possibility that the inference was not particularly strong—the prosecutor did not even mention this evidence during his summation.

court admitted Burrell's testimony about the show-up procedure, and the Victim's head-shake in response to it, pursuant to a New York statute that allows for such testimony where the percipient witness who made an out-of-court identification testifies that she is no longer able to make the identification herself. *See* N.Y.Crim. Proc. Law § 60.25.[27] However, as noted above, when the Victim testified before the jury, she stated unequivocally that, as she sat on the witness stand, she *could* remember what the man whom she identified to Burrell looked like—and that she did not see that man in the courtroom. TT 572. On such a record, Burrell's testimony about the show-up procedure would have been inadmissible. The prosecutor pressed the Victim to answer again however, and this time secured the opposite answer—the Victim said she did not remember. *Id.*

Maltz neither objected to the prosecutor's successful attempt to secure a second answer more to his liking than the first,

nor pointed out the significance of the changed answer. *See id.* Indeed, based on the later colloquy that occurred when the prosecutor sought to recall Burrell to testify to the show-up procedure, it appears that Maltz did not appreciate the significance of the change or understand what the applicable statute required. The court had to explain the necessary foundation to him repeatedly. TT 614–18.[28] Moreover, when the court did so, Maltz did not point out that the Victim had stated an ability to recall that would preclude the admission of Burrell's testimony; he instead pointed out other irrelevant portions of the record. As with Jagpal's grand jury testimony, Maltz's apparent failure to appreciate the applicable law deprived Gueits of an important argument to exclude potentially damaging testimony.

### ii. *EMT Sawyer*

Sawyer testified that he was sent to the Harvard Playground on the morning of

---

**27.** Section 60.25 ("Rules of evidence; identification by means of previous recognition, in absence of present identification") provides as follows:

1. In any criminal proceeding in which the defendant's commission of an offense is in issue, testimony as provided in subdivision two may be given by a witness when:
 (a) Such witness testifies that:
 (i) He observed the person claimed by the people to be the defendant either at the time and place of the commission of the offense or upon some other occasion relevant to the case; and
 (ii) On a subsequent occasion he observed, under circumstances consistent with such rights as an accused person may derive under the constitution of this state or of the United States, a person whom he recognized as the same person whom he had observed on the first or incriminating occasion; and
 (iii) He is unable at the proceeding to state, on the basis of present recollection, whether or not the defendant is the person in question; and

 (b) It is established that the defendant is in fact the person whom the witness observed and recognized on the second occasion. Such fact may be established by testimony of another person or persons to whom the witness promptly declared his recognition on such occasion.

2. Under circumstances prescribed in subdivision one, such witness may testify at the criminal proceeding that the person whom he observed and recognized on the second occasion is the same person whom he observed on the first or incriminating occasion. Such testimony, together with the evidence that the defendant is in fact the person whom the witness observed and recognized on the second occasion, constitutes evidence in chief.

**28.** The court had earlier stepped in to keep Maltz from inadvertently opening the door to the show-up testimony without requiring the prosecutor to lay a proper foundation. TT 515.

July 4, 2001, to treat someone for a major injury. He arrived at the scene to find the Victim lying on her back with a bruised and bloody head. TT 384–90. As part of his examination, he asked the Victim what was hurting, and she told him it was her head. In response to further questions that Sawyer asked to determine her condition, the Victim stated that she did not know which day of the week it was or who was the President of the United States. TT 390–92. Sawyer described the Victim's extensive injuries and noted that while one eye was normal the other was "[u]nable to attain" due to the blood and swelling that surrounded it. TT 396. After trying to measure the Victim's blood pressure and finding it too low to gauge, Sawyer concluded that the Victim was in critical condition. TT 397. Sawyer saw that the Victim went in and out of consciousness during the seven-to-eight minute period he was with her at the scene. TT 397–98.

After eliciting these details about the Victim's condition from Sawyer, the prosecutor sought to move on to the subject of the Victim's transportation to the hospital (during which Sawyer accompanied her, *see* TT 398–400). In doing so, however, the prosecutor explicitly instructed Sawyer "not to say anything that the Victim said when they brought [Gueits] over. Don't testify about that." TT 398. On cross-examination, however, Sawyer revealed what the prosecutor sought to avoid: as Sawyer recorded in his report, the Victim had stated that "the person who raped her also beat her." Sawyer confirmed not only that the Victim made the statement, but that "[s]he said that right in front of me and my partner and the police officers." TT 405.[29]

### iii. *Gueits's Statement To Detective Porter*

Detective Porter recounted his interview of Gueits, which began at approximately 9:45 on the morning of the arrest. TT 596. He gave the following summary of Gueits's statement:

> He said that at about 11 o'clock in the evening . . . he was at a local bar, located about 3 blocks away on Jamaica Avenue with a friend of his known as Freddie.
>
> They stayed in the bar till about 1:30. After they left the bar they went to a 24 hour deli . . . and bought a hero and some beers. Then they went to . . . [the Harvard playground].

29. In so testifying, EMT Sawyer provided an account that differed in important respects from the trial testimony of the arresting officers—whose testimony again proved remarkably expedient to the theory the prosecution adopted after its initial decision to charge Gueits with rape became untenable. As already noted, evidence that the Victim contemporaneously claimed to have been beaten and raped by the same man was consistent with the original prosecution theory—that Gueits was solely responsible for both crimes—but inconsistent with the later theory that Gueits committed the assault despite having been excluded as the rapist. The police officers' accounts changed to accommodate each theory: while Burrell's original complaint report included the assertion (consistent with Sawyer's trial testimony) that the Victim "stated" that she had been raped and assaulted by a single "perp", by the time of the trial both Burrell and Wilson recalled that the Victim was unable to say anything recognizable when they found her. The latter description—combined with the testimony about the Victim's head-shake in response to the show-up—dovetailed precisely with the prosecution theory that the Victim was able to identify Gueits as her assailant but was able to do so only by gesturing in response to a leading question that was sufficiently ambiguous to exclude Gueits as the rapist while implicating him in the assault. Maltz did not remark on the malleability of the officers' testimony, either to dissuade the jury from relying on it or to persuade the court to order relief with respect to the DNA evidence.

Some time while ... he and Freddie were in the park, a female Hispanic entered the park with a male black. He said he recognized the female as having been in the sports bar. He then said the male black attacked the female Hispanic and that she came running over to him, naked, and he pushed her away. And he denied raping the woman or assaulting her.

TT 600–01.

In his cross-examination of Porter, Maltz elicited that the interview so summarized lasted some twenty minutes, that Gueits was cooperative throughout, including when he provided the police with his clothing and oral swabs. TT 611. The detective confirmed that he knew that Gueits had been charged with beating and raping the Victim and also expressed his certainty that, during his time with Gueits, he had looked at Gueits's hands.[30] Nevertheless, when Maltz asked whether Porter had noticed whether Gueits had any blood on his hands, the detective, like Burrell and Wilson had already done, swore that he was unable to recall. TT 604–06.

### iv. Other Evidence

Meredith Rosenberg, a criminalist in the Office of the Chief Medical Examiner of New York City, was qualified as an expert in forensic biology and DNA testing. TT 519–24. She opined that the Victim's blood was found on Gueits's right sneaker. TT 541.[31] Although the identification of the Victim's blood on Gueits's sneaker—and the absence of any evidence of her blood anywhere else on Gueits's person or clothing—was completely consistent with Gueits's statement to the police at the time of his arrest and tended to bolster rather than undermine the theory of the defense, Maltz sought to impeach the criminalist's credibility by focusing his entire cross-examination on an uncorrected discrepancy in her report that the prosecutor easily demonstrated to be a typographical error on redirect examination. See TT 542–50.

Dr. Richard Chang, a surgical resident at the hospital where the Victim received treatment, was qualified as an expert in trauma surgery. TT 634–36. He testified to the Victim's extensive injuries and the treatment she received, TT 646–50, and also opined that her condition was consistent with "multiple assault," meaning "multiple blows throughout her body." TT 651. In cross examining Dr. Chang, Maltz did not challenge any of his testimony, but instead sought to elicit from him a statement that the Victim had allegedly made to a nurse at the same hospital. TT 654.

---

**30.** The respondent appears to make the suggestion that Gueits's denial of the rape during this interview was itself proof of his guilt. He argues that Gueits independently broached the subject of rape without having any reason to know it had occurred if he had not been involved in it. See Opp. 17 n. 6. Such reasoning suffers from several obvious flaws. For example, Porter's account of the interview plainly elides most of what was said during the twenty minutes he spoke with Gueits, and is silent as to whether Porter told Gueits of the pending rape charge or whether Gueits knew of that charge by some other means. More importantly, the argument suffers from the logical fallacy of assuming its conclusion. Gueits told Porter that he witnessed the attack on the Victim. If that is true, and if it is also true as the Victim repeatedly said on the day of the crime, that a single person raped and beat her, then anyone witnessing the entire attack could have known that the Victim was raped—and would have understandably wanted to deny participation in that crime.

**31.** Just before Rosenberg took the witness stand, the court read to the jury a stipulation to the effect that an examination had revealed the presence of semen in the swabs taken from the Victim at the hospital where she was treated, that the swabs had been subjected to DNA testing, and that Gueits was not the source of the semen found on either swab. TT 518.

The court prohibited the inquiry because Maltz had not laid a foundation by first asking the Victim about the statement. TT 655. Instead of seeking an opportunity to lay a foundation, Maltz withdrew the question and asked nothing further on cross-examination. *Id.*[32]

### 2. *The Defense Case*

Maltz did not present any affirmative case on his client's behalf. His failure in that regard was not a result of the absence of any useful evidence, nor even of his own failure to appreciate the exculpatory value of certain facts. Instead, Maltz failed to present affirmative evidence that would have helped his client only because he did not collect the evidence in usable form and because he could not persuade the prosecutor to save him from that lapse by stipulating to the facts Maltz wished to prove.

As noted above, a week before the start of trial Maltz sought to secure a stipulation that the DNA recovered from the Victim excluded Gueits but matched the DNA recovered from a rape victim in Maryland who had described her attacker as an African–American man. The prosecutor did not relent with respect to the latter part of the request (the only part that tended to undermine his case by corroborating Gueits's exculpatory statement), but he did stipulate, during the State's case-in-chief, that Gueits had been excluded as the source of the DNA (a concession that was fully consistent with the revised prosecution theory that Gueits assaulted the Victim after another man raped her). TT 518.

Maltz did not attempt to collect or present affirmative evidence that corroborated his client's statement. Instead, when it was his turn to present evidence, he simply reiterated his request for a stipulation. The request prompted the trial judge to ask how such a stipulation would be relevant to the case on trial. TT 677. There was, of course, a persuasive answer: evidence tending to show that an African–American male had raped the Victim would corroborate the statement Gueits made at the time of the arrest that gave the same description of the assailant. Moreover, those the two pieces of mutually consistent evidence would in turn corroborate (and be corroborated by) Sawyer's testimony that the Victim had initially said she was raped and beaten by the same man, and would be entirely consistent with the admissible portions of Jagpal's testimony. Maltz, however, did not give that persuasive answer, or indeed any answer; he merely reiterated his request and insisted, without explanation, that it was just:

> THE COURT: What is the relevance to this case?
>
> MR. MALTZ: I am asking the D.A. to bring forth to the jury, by stipulation, that the police were looking for a male black whose semen is similar to that was found in Maryland.
>
> MR. FERINO: No, I won't stipulate to that.
>
> MR. MALTZ: I don't know why, in the interest of justice.

---

**32.** The content of the hearsay statement by the nurse that Maltz sought unsuccessfully to elicit from Dr. Chang (and that he never sought to adduce by calling the nurse herself as a witness, *see* ET 58–61) was set forth in a report that Officer Burrell prepared on the day of the arrest. Specifically, the nurse told Burrell that the Victim reported that her assailant had raped her after beating her. PX 6. Such testimony would obviously have provided important corroboration for a critical disputed premise of the defense theory that Maltz had hoped to pursue by having the prosecutor stipulate to the race of the man whose DNA was recovered from the Victim.

THE COURT: Not in the interest of justice.

MR. MALTZ: It is.

THE COURT: The jury is to decide whether or not the defendant assaulted the Victim in this case and this other material is extraneous.

MR. MALTZ: I don't believe so.

THE COURT: In any event, the D.A. declines to stipulate.

TT 677. Maltz made no further attempt to get the information about the DNA match with the African–American male wanted for rape in Maryland to the jury.[33] He then rested his case without calling any witnesses. See TT 678–81.

### 3. Closing Arguments

#### a. The Defense Summation

In his summation, Maltz argued that his client's voluntary statement on the morning of his arrest was consistent both with his innocence and with the bulk of the prosecution's evidence. He explained how that statement jibed with the Victim's account (including the details she could remember and those she could not—in particular, her inability to identify Gueits as her assailant); the evidence regarding the blood found on his client's shoe (and the lack of evidence as to its presence elsewhere); the officers' testimony about find-

ing him in the playground; and, perhaps most importantly, the evidence that the Victim had claimed to have been beaten and raped by the same man—a man whom the DNA evidence excluded as both Gueits and his companion Freddie. See TT 696–725. Maltz even explained how the jury could reconcile Gueits's statement to Detective Porter with the proposition that Jagpal had seen Gueits and the Victim together in the park (by positing the possibility that she had witnessed Gueits pushing the Victim away from him when she sought his help). TT 714. What Maltz was unable to do was to cite the most compelling evidence that corroborated his client's account of having witnessed a black man commit the assault: evidence that such a man had been identified as the source of the DNA recovered from the Victim who said she had been raped by the same man who had beaten her.[34]

Maltz also sought to blunt the incriminating aspects of the prosecution's case—evidence that he had to confront only because his failure to make arguments available under applicable law had allowed the evidence to be admitted. With respect to Jagpal's grand jury identification of Gueits as the assailant, he argued that the evidence showed that the playground was too dark to accord any reliability to the testi-

---

**33.** The respondent now argues that the DNA evidence would only have been admissible if Gueits had testified directly and repeated the exculpatory statement he had given to Detective Porter. See Opp. 44. Neither the trial judge nor the trial prosecutor raised such an objection when discussing the relevance of the DNA evidence, and understandably so: the prosecution had unquestionably opened the door to it, if presented in admissible form, by introducing Porter's account of Gueits's statement in an attempt to show that Gueits had consciousness of his guilt.

**34.** The respondent's contention that the DNA evidence could not have helped Gueits be-

cause he did not explicitly tell Porter that he saw a black man "rape" the Victim, see Opp. 43, ignores the fact that it was the Victim herself who said—repeatedly—that she was assaulted by the man who raped her. Whether or not Gueits himself saw the portion of the attack in which the Victim was raped is entirely irrelevant: the Victim said she had but one assailant (as the State itself did, at least until such an assertion became inconsistent with convicting the man it had in the dock), and so evidence that that sole assailant was someone other than Gueits would inevitably tend to exonerate him with respect to the assault charge.

mony, which Maltz described as "mistaken and confused." TT 703. And in response to Officer Burrell's testimony about the Victim's reaction when the officers brought Gueits before her at the scene, Maltz argued that the circumstances made it impossible to determine whether the Victim understood the question and whether she intended her head-shake to identify Gueits as the man who had attacked her. TT 723.

#### b. *The Prosecution Summation*

Just as Gueits's exculpatory statement was the major theme of the defense summation, so too did it occupy a significant portion of the prosecutor's closing argument, along with incriminating evidence that should never have been admitted. There was, however, one important difference in the way the two lawyers dealt with Gueits's statement: while both the prosecutor and the defender compared the statement to other evidence before the jury, only the prosecutor sought to use the statement to support an argument he knew to be false. Specifically, as described below, the prosecutor sought to characterize Gueits's description of the events as a false exculpatory statement that attempted to pin blame for the crime on a "mysterious" black man, TT 741–42, while in fact he was aware that there did indeed exist a black man whose DNA had been found in the Victim.

The prosecutor's misuse of the evidence regarding Gueits's statement began almost

immediately. After glossing over the absence of any evidence of motive, *see* TT 727 ("it doesn't matter why he did it because nothing could ever justify the type of behavior that John Gueits engaged in when he almost killed this woman"), the prosecutor launched into an argument that dismissed Gueits's statement as a "story to the police" that was "unbelievable[.]" *Id.*[35] After characterizing Gueits's statement as one that "does not match up with reason and . . . our common sense and good judgment," TT 728, the prosecutor sought to keep the jury from considering the significance of the DNA evidence that excluded Gueits as the source of the semen found in the rape Victim by asserting that "we don't know beyond a reasonable doubt who violated [the Victim] sexually, how many people, what they did, what role, if any, he played in that and so we didn't charge him with rape." TT 729. In fact, the prosecutor did know that the State had indeed charged Gueits with rape, based on the Victim's statement—which Burrell recorded in her contemporaneous complaint report—that she had been raped and beaten by one man. Moreover, although the prosecutor modified his misleading argument with the words "beyond a reasonable doubt," there is no dispute that the State already knew that the semen donor was a black man who was also wanted for the rape of a 13–year–old girl in Maryland.

Having falsely told the jury that Gueits had not been charged with rape, the prose-

**35.** The quoted remark drew an objection that the court sustained. TT 727–28. It was but the first of seven times that the court curbed the prosecutor's improper summation arguments. *See also* TT 728 (curative instruction following prosecutor's argument that "we know his statement is not true"), TT 730 (sustaining objection to prosecutor's reference to evidence that he himself successfully objected to during Maltz's summation), TT 733 (sustaining objection to improper discussion of grand jury proceedings), TT 737 (sustaining objection to prosecutor's improper argument vouching for the proposition that Jagpal was "scared" as an explanation for her failure to identify Gueits in court), TT 742 (instructing the jury to disregard prosecutor's suggestion that the DNA evidence could be explained by the possibility that Gueits "didn't ejaculate"), TT 743 (sustaining an objection when the prosecutor immediately returned to the same topic and again suggested that "[d]rinking causes someone to not perform or ejaculate").

cutor then gave what appears to be a manifestly false explanation for that charging decision: "We don't know every detail of the sexual attack that [the Victim] suffered, that is why John Gueits is not charged with it." TT 730. The implicit suggestion that there was some evidence outside the trial record that incriminated Gueits in the rape, but not enough for a responsible prosecutor to bring a charge, was false on several levels: there was no additional evidence, the evidence not presented to the jury tended only to corroborate Gueits's exculpatory statement, the State had not waited to "know every detail of the sexual attack" to charge Gueits with rape, and the State had decided to drop its rape charge only when confronted with DNA evidence that conclusively refuted it.

After misleading the jury about the charging decision, the prosecutor went on to rehearse at length Jagpal's testimony—not her trial testimony, which did not inculpate Gueits, but rather the impeaching grand jury testimony that should never have been admitted. See TT 732–37.[36] He then went on to make an extended argument that characterized Gueits's statement as an attempt at false exculpation upon which the jury could rely to find Gueits guilty of the charged assault. Central to that argument was the prosecutor's dismissive description of the assailant that Gueits had described as a "mysterious black" man whose existence Gueits had likely invented.

> MR. FERINO: Okay. His statement to Detective Porter also proves his guilt. How? Because all of a sudden John Gueits realizes that he's got something to explain. . . . Mr. Maltz calls it cooper-

ation. You know what I call it? Trying to figure out how he is going to explain away this very damning evidence that is on his feet. . . .

> . . .

> [Gueits's statement] is unbelievable. That statement, which [Maltz] says exonerates his client, establishes his guilt in this case because it . . . entirely defies all logic and reason. It is a story, it is the one that [Gueits] came up with when the police asked him . . . [t]o tell them his side. It just doesn't add up. John Gueits sitting in the park, watching a savage beating, a man, *this mysterious black he wants to pin it on.*

TT 740, 741–42 (emphasis added; objections and rulings omitted). After contrasting Gueits's statement with evidence that the prosecutor claimed it failed to answer—primarily Jagpal's inadmissible grand jury testimony—the prosecutor then closed his summation with a peroration that again mocked the statement as unbelievable:

> To believe he didn't do it, to believe it was someone else is to believe that someone who looks so much like him, to fool Sunnita Jagpal, came, did the crime, mysteriously vanished into thin air and here comes poor John Gueits sitting on the bench, drinking his beer in the rain with her blood on his feet. A ridiculous story, doesn't make any sense.

TT 745.

### 4. Counsel's Failure To Object To A Plainly Erroneous Jury Charge

As the preceding summary of the trial reveals, the prosecution did not call a sin-

---

**36.** The prosecutor's argument also appeared to make the wholly improper suggestion, devoid of any support in the record and indeed contrary to Jagpal's own testimony, that Jagpal's testimony deviated from her grand jury appearance to the trial because she was afraid of Gueits, who was not present to intimidate her in the grand jury. See id.; see also TT 738 ("ladies and gentlemen, John Gueits doesn't get to benefit from Sunnita Jagpal's fear").

gle witness who testified that Gueits committed the assault for which he was indicted. The only two percipient witnesses who testified were the Victim and Jagpal; neither identified Gueits as the assailant. Instead, the jury heard evidence that tended to incriminate Gueits from two sources: Burrell's testimony about the Victim's reaction to the show-up procedure, and Jagpal's statements to the grand jury. Neither was admissible under applicable law but both were nevertheless admitted due to Maltz's failure to ask the court to apply the law as written. Moreover, the latter evidence—Jagpal's grand jury testimony—could only have been admitted as impeachment; the law explicitly prohibited its use as evidence-in-chief. N.Y.Crim. Proc. Law § 60.35(2). The jury was told none of this. Instead, the judge incorrectly instructed the jury, on multiple occasions, that the evidence *did* include eyewitness identification testimony, from multiple witnesses, and that the jury could consider it as evidence of Gueits's guilt:

> There was testimony by witnesses [sic] called by the People that the defendant committed the offenses charged. Under our law, the identification of an accused, even by a solitary witness, as one involved in the commission of a crime, is in and of itself sufficient to justify a conviction of such person, provided, of course, that you are satisfied that the People have proven beyond a reasonable doubt the identity of the accused as one who committed the crime.
>
> [Gueits pleaded not guilty,] thereby putting in issue every material allegation

in the indictment, that includes his identification as the perpetrator by the People's witnesses [sic].

TT 758; *see also* TT 759 (instructing jurors to "consider the capacity of identifying witnesses [sic] to observe"), TT 760 (instructing jurors of their "right to consider ... the powers of observation of identifying witnesses [sic]").

Maltz did not object to that critical error at the charge conference. *See generally* TT 682–86 (charge conference). To the contrary, it appears that the court quite properly did *not* include in the written draft charge it gave counsel any instruction on the evaluation of identification testimony—there had been none—but then acceded to Maltz's request "for a charge of identification." TT 684. The record is not clear as to whether Maltz saw in advance the specific language of the identification instruction that the court eventually gave,[37] but it does plainly show that Maltz failed to object either in advance or immediately after the court gave the instruction that repeatedly but erroneously suggested that there had been multiple "witnesses" who had testified at trial that Gueits was the Victim's assailant. Maltz likewise failed to request at the charge conference, or later to object to the omission of, an instruction that the jury could only consider Jagpal's statements to the grand jury as impeachment of her credibility, and not as evidence of Gueits's guilt.

### 5. The Verdict And Sentence

The court's charge was completed just before the lunch break on April 4, 2002.

---

**37.** The court responded to Maltz's request by saying, "Yeah, I'll get it for you." TT 684. Moments later, Maltz asked to see the specific language that the court would use, noting that there were several versions of it, and then asked whether it would be the "C.J.I." version. TT 685. In describing the charge he planned to give, the court said, "I think it is basically that, but there are parts that could be added or deleted. I'll hand you the charge. You are familiar with it, I'm sure." *Id.* The record reflects that the court handed something to counsel, but does not describe its content. *Id.* Maltz did not raise the issue again for the remainder of the trial.

*See* TT 773–75. That same afternoon, the jury sent a note asking to hear a read-back of Jagpal's testimony concerning the 911 call and to see Gueits's clothing and sneakers, a photograph of the sneakers, and a map of the playground. TT 776. After the read-back, the jury went back to continue its deliberations and the parties' attorneys began to discuss dismissing the alternates. Within moments, however, that colloquy was interrupted by a second note from the jury reporting that it had reached a verdict. TT 777–79. The jury found Gueits guilty of first-degree assault. *Id.*

At the sentencing hearing later that month, Maltz argued for the first time that the court had "incorrectly allowed [Jagpal's] testimony to be introduced on the direct case as evidence in chief." ST 3. The judge rejected his argument and sentenced Gueits to a term of 15 years in prison. ST 24.

### D. *Post–Conviction Proceedings*

There is no dispute that Gueits sought to overturn his conviction on direct appeal by claiming, as he now does in seeking habeas relief, that he was denied the effective assistance of counsel at trial. The respondent nevertheless contends, as he is entitled to do under applicable law, that the court should deny the instant petition in part because Gueits failed adequately to preserve some of the precise criticisms of his trial counsel on which he now relies. In light of that argument, I recount here in some detail the specific arguments that Gueits raised in seeking relief on his ineffectiveness claim in the courts of New York State.

### 1. *Direct Review In The Appellate Division*

In seeking direct review of his conviction, Gueits submitted a memorandum of law—which the respondent now claims failed to preserve portions of the instant claim of ineffectiveness—consisting of 70 pages, the argument of which was organized under four primary point headings. The first asserted that the conviction was against the weight of the evidence presented at trial. Petition Ex. B ("App.Div.Br.") at 35. The second point collected three separate arguments under the overarching assertion that Gueits had been denied his right to due process of law: (a) the improper impeachment of Jagpal with her grand jury testimony; (b) the trial court's failure to prohibit the jury from considering that impeachment as evidence-in-chief; and (c) the prosecutor's improper suggestion in closing argument that Jagpal was afraid of Gueits. *Id.* at 41. The third point complained of the prosecutor's improper vouching and knowingly false and inflammatory statements during the summation. *Id.* at 52.

It was only in his fourth point that Gueits explicitly argued that he had been deprived of his right to the effective assistance of counsel at trial. *Id.* at 63. In doing so, he explained at length two aspects of Maltz's performance that fell below the constitutional floor. But in addition—both in the point heading that introduced the claim and the argument that followed—Gueits explicitly adverted to other ways in which Maltz's representation was ineffective. The point heading asserted that

> Appellant was denied his right to the effective assistance of counsel when his attorney, *inter alia,* (a) failed to present powerful additional exculpatory evidence, and (b) not only failed to request a limiting charge as to key impeachment evidence, but affirmatively agreed to a charge that suggested it should be considered evidence in chief.

*Id.* (emphasis added; capitalization removed).

In the body of the argument, Gueits made explicit the other errors to which the point heading's use of *"inter alia"* referred. Specifically, after several pages of argument on the two errors explicitly cited in the point heading, Gueits presented the following argument:

In addition to these major failings, defense counsel blundered in other ways. Although he concededly made a coherent motion to dismiss and summation, he made only general objections to most of the prosecutorial misconduct (*see* points II(C) and III, *ante*), thus failing to preserve many of the People's and court's errors for review. By failing adequately to challenge these statements, counsel allowed the People to "undermine" the credibility of the entire "defense being advanced," *People v. Brugman* [citation omitted], and to transform what should have been defense assets into liabilities. *People v. Ofumniyin,* [citation omitted]. Also, although counsel opposed Ms. Jagpal's impeachment with her grand jury testimony, that opposition was so confused and inept as to suggest that he was totally unfamiliar with the statute involved and never even bothered looking at it when the issue arose ([TT] 439–440, 441, 442–443).

App. Div. Br. at 69. This argument plainly advised the appellate court that the due process and prosecutorial errors described under previous point headings were attributable to Maltz's constitutionally deficient performance, and it also made explicit the proposition that if those errors had not been preserved for appellate review, it was Maltz's fault.

The Appellate Division unanimously affirmed the conviction. Notwithstanding the many troubling aspects of Maltz's performance at trial, and the pervasive effect of those lapses on the entire case, the court addressed the contention that Gueits had been deprived of the effective assistance of counsel in a single boilerplate sentence. The appellate court's analysis of the issue, in its entirety, was as follows: "The defendant's contention that he was denied the effective assistance of counsel is without merit, as the record demonstrates that he received meaningful representation." *People v. Gueits,* 10 A.D.3d 732, 781 N.Y.S.2d 916, 916 (App.Div.2004) (citing *People v. Henry,* 95 N.Y.2d 563, 721 N.Y.S.2d 577, 744 N.E.2d 112 (2000); *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981)).

The court was similarly dismissive of Gueits's argument about the weight of the evidence, disposing of it in a single paragraph. *Id.* Finally, the court in a single sentence rejected the remaining claims of due process violations and prosecutorial misconduct—claims that Gueits had explicitly subsumed within his ineffectiveness argument—without reaching the merits; instead, the court ruled that Gueits had failed properly to preserve the issues for appellate review. *Id.* at 917. In doing so, the court did not comment on the fact that the attorney who had failed to preserve Gueits's appellate rights was the same attorney whom Gueits claimed had been ineffective in allowing the errors to occur—nor did it even acknowledge the argument on appeal that Maltz had been constitutionally ineffective in part because of his "fail[ure] to preserve many of the People's and court's errors for review." App. Div. Br. at 69.

### 2. *The Unsuccessful Request For Leave To Appeal*

Following the appellate court's denial of relief, Gueits sought discretionary review by the state's highest court. In his application for leave to appeal, Gueits raised

two issues: the improper impeachment of Sunnita Jagpal (which the lower appellate court had decided was not preserved for review), and the ineffectiveness of his trial counsel. In raising the latter, Gueits asked the court to review "whether defense counsel was ineffective when, *inter alia*, he made no effort (other than unsuccessfully requesting a stipulation) to get critical exculpatory evidence before the jury, and he effectively acquiesced in the jury's consideration of Ms. Jagpal's grand jury testimony as evidence in chief." Leave App. 1 (emphasis added).

The letter-brief seeking leave to appeal went on to explain at some length the two specific sub-claims identified above. *See id.* at 6–7 (regarding the failure to introduce exculpatory DNA evidence); *id.* at 7–8 (regarding the improper admission and use of Jagpal's grand jury testimony). Gueits also made it clear to the Court of Appeals, however, that those two specific sub-claims were not the only ways in which he believed that he had been denied his right to effective counsel; rather, he asserted that "defense counsel's preparation and performance were deficient in additional respects" and that the two issues discussed in detail were only the ones that he described as "particularly shocking[.]" *Id.* at 6. Likewise, the application ended by raising "the real possibility that [Gueits] has been convicted based on a combination of the People's improper tactics and his

own attorney's inadequate preparation and otherwise inexplicable blunders." *Id.* at 9. Gueits therefore asked the Court of Appeals to grant leave "on the remaining issues raised in [his] Appellate Division brief." *Id.* Gueits did not simply rely on an allusion to that brief, however; he also directed the court's attention to specific parts of the record that related to the specific issues raised in that submission. *See id.* (citing, *inter alia*, TT 414–480 (including the improper admission of Jagpal's grand jury testimony), 726–45 (prosecutor's summation)).[38] The Court of Appeals denied Gueits's application for leave to appeal on December 13, 2004, without opinion. *People v. Gueits*, 4 N.Y.3d 744, 790 N.Y.S.2d 657, 824 N.E.2d 58 (Ct.App.2004).

### E. *The Instant Habeas Proceedings*

#### 1. *The Petition*

Gueits filed the instant petition for a writ of habeas corpus on February 27, 2006.[39] In it, he claims that he was denied his right under the Sixth Amendment to the effective assistance of counsel in a variety of ways. First, he complains that Maltz failed to investigate and to present evidence that the DNA recovered from the Victim on the morning of the assault matched the DNA of a specific African–American man whose DNA had likewise been recovered from another rape vic-

---

**38.** Just as Gueits relied on a reference to his brief to the Appellate Division to raise certain aspects of his request for leave to appeal, so too did the State rely on its submission on direct appeal in opposing the request. *See* Petition Ex. E (letter opposing leave to appeal) at 7 ("Moreover, the People rely on . . . their brief submitted to the Appellate Division, and the decision of that court, in respectfully requesting that defendant's application be denied.").

**39.** There is no dispute that the petition was timely. Applicable law afforded Gueits one

year to file his petition starting on the date that the state court's denial of relief became final. *See* 28 U.S.C. § 2244(d). The denial of leave to appeal was issued on December 13, 2004, and became "final" for purposes of seeking habeas relief 90 days later, on March 13, 2005, when the time to seek a discretionary writ of certiorari from the United States Supreme Court expired. *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir.2001). As a result, Gueits had until March 13, 2006, to seek habeas relief in this court.

tim—evidence that would have tended to corroborate Gueits's exculpatory statement about the assault with which he was charged. Second, Gueits asserts that Maltz was ineffective in his failure to make the correct objection to the prosecutor's attempt to impeach Jagpal under circumstances prohibited by state law. Third, Gueits contends that Maltz compounded his lapse with regard to Jagpal's testimony by failing to object to the use of the impeachment evidence as evidence-in-chief and instead agreeing to a jury charge that permitted such improper consideration of the impeachment. Fourth, Gueits argues that Maltz was deficient in failing to object when the prosecutor put his own credibility in issue during Jagpal's direct examination. Finally, Gueits seeks relief based on Maltz's failure to raise and preserve proper objections to the prosecutor's misconduct during the summation. Petition at 38.

The respondent opposes Gueits's petition on both procedural and substantive grounds. First he contends that some (but not all) of Gueits's arguments may not properly be asserted in this collateral attack because they were not sufficiently brought to the attention of the state courts on direct review of the conviction; in particular, the respondent makes this procedural default argument as to the second, fourth, and fifth prongs of Gueits's claim (relating to the impeachment of Jagpal, the prosecutor's injection of his own credibility into the proceedings, and the misconduct during the summation, respectively). The respondent further argues that none of Gueits's arguments has substantive merit. Opp. at 19–20.

### 2. The Evidentiary Hearing

Maltz testified about his performance as trial counsel at a *Sparman* hearing on February 27, 2007. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir.1998) (per curiam) ("a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs"). Maltz stated that he had been Gueits's counsel from the inception of the case, beginning with his assignment as an "18–B attorney" a day or two after Gueits's arrest. ET 11. As discussed in detail below, Maltz's testimony made it clear that the aspects of his performance that Gueits characterizes as ineffective were not the result of any strategic decisions but were simply mistakes.

#### a. DNA Evidence

Maltz acknowledged that before the trial began, he had learned that the DNA swabs taken from the Victim matched the DNA taken from a rape victim in Maryland who had described her assailant as a black man, and that the information he was provided also included contact information for the police officers handling the latter investigation. ET 14–18, 21–22. Nevertheless, Maltz did not contact the officers or take any steps to secure the DNA evidence for presentation at trial because he "was hoping to get [it] into evidence by a stipulation[.]" ET 22. Maltz further explained, "I was getting ready for trial. I had a lot of things to do." ET 23.[40]

---

**40.** To be sure, Maltz's testimony at the *Sparman* hearing included a statement indicating that he made a tactical judgment that so long as he secured a stipulation that Gueits was not the source of the DNA recovered from the victim, adducing additional evidence that the source was a black male would be unimportant. ET 22–23. Crediting that account would require an analysis of whether that tactical decision constituted unreasonably poor performance. While I believe the answer to the latter question is "yes," the court

230

A separate explanation that Maltz gave for not securing the evidence in admissible form was that the trial judge had ruled it irrelevant. Indeed, Maltz seemed to think that the trial judge had forbidden him even to try: when asked if he had prepared to present the DNA evidence in any way other than a stipulation, he replied "I didn't know how I could do that without disobeying the judge's order. I wasn't prepared to do it myself. . . . I don't know how I could have done that." ET 35–36. After further questioning, however, Maltz acknowledged that the trial judge had not

expressed any view on the relevance of such evidence until the start of jury selection. See ET 36–39.[41]

Moreover, while Maltz acknowledged that he had arguments about the relevance and utility of the DNA evidence "on [his] mind," ET 39, he did not actually make them. Those arguments included the propositions that the DNA evidence would support the credibility of the statement Gueits made on the day of his arrest, that it would preclude the prosecutor from characterizing the statement as a false ex-

---

need not address it because Maltz's testimony in that regard is belied by the record: Maltz did in fact try to get the prosecutor to stipulate to the fact that the source of the DNA was a black male. See TT 677. Indeed, moments after saying at the *Sparman* hearing that he had felt it to be unimportant to adduce evidence that the source of the DNA was a black male, Maltz reversed course—as far as I could tell, without even being aware of the inconsistency—and agreed that he has "realize[ ]d that the connection between the DNA and a black man was helpful to the defense[.]" ET 34; *see also* ET 35 ("I thought it was important to show that connection"); ET 28–29 (stating that he had tried to explain to his client the importance of adducing such testimony in discussing whether to seek a delay of the trial); ET 33 (noting that he did ask the prosecutor to stipulate that the DNA source was a black man). In this respect as in several others, Maltz's recollections in 2007 about what he did at the trial in 2002, and about when and why he made certain decisions, were demonstrably unreliable. *E.g. compare* ET 24 (Maltz's testimony that he asked for a postponement of trial so that he could explore the DNA disclosure further, and that his request was denied) *with* TT 3–5 (court offering Maltz an opportunity to seek a delay and Maltz turning it down based on his client's preference).

**41.** In fact, the trial transcript clearly demonstrates that a week before the trial started, on March 25, 2002, the court affirmatively told Maltz that he *could* introduce the DNA evidence—evidence that the court quite reasonably believe Maltz already had.

THE COURT: . . . Finally, we have motions in limine. I don't know, there is no charge of rape. Do you intend to—I don't know, Mr. Maltz may want to bring this out, or how do you want to handle this?
MR. FERINO: Given I have conceded it had been in the felony complaint she did at the time of the arrest and identification say that he had raped her, I don't really oppose Mr. Maltz going into that on his cross-examination. I see that it—
THE COURT: You won't, just so that we're clear on this, under the current case law the Court has to balance your allegations that the crime was committed by somebody else. *You have the DNA evidence of that,* based upon the allegations of rape and the fact that semen had been recovered from the Victim. Based upon that the scientific nature of that evidence *I will permit you to put that defense forward before the jury.* Therefore, that is your application, is that right?
MR. MALTZ: *Yes.*
THE COURT: *Inasmuch as that is your defense, that someone else raped the Victim, that matter will be gone into as well on direct examination, even though it involves a crime not charged on the indictment, it is the defense.*
TT at 12–13 (emphasis added). Despite this obvious signal that DNA evidence would be permitted to advance what the court described as "the defense," Maltz did nothing to obtain such evidence. Instead, he merely hoped that the prosecutor would make such preparation unnecessary by entering into a stipulation. Even when it became clear that the prosecutor would not do so, Maltz made no effort to secure the evidence.

culpatory statement demonstrating consciousness of guilt,[42] that it would undermine any testimony purporting to identify Gueits as the assailant, and that it would bolster Gueits's exculpatory explanation for the fact that the Victim's blood was found on his sneaker. *See* ET 39–41, 44–45, 50–51.[43] To the contrary, Maltz acknowledged that he did not make any offer of proof regarding the DNA evidence once the judge expressed the opinion that it was not relevant. ET 39.

Maltz's testimony at the *Sparman* hearing also illustrated another facet of his failure to elicit the DNA evidence. Evidence that the DNA was provided by a black male tended to exonerate Gueits on the assault charge because the Victim had told EMT Sawyer that she had been raped and assaulted by the same man. But as the *Sparman* hearing revealed, the Victim did not just make that statement to Sawyer while awaiting treatment at the playground, she said it again later that day at the hospital—and added a detail that further undermined the prosecution's evidence. At the trial, in his cross-examination of Dr. Chang, Maltz had unsuccessfully attempted to elicit a hearsay statement made by a nurse. TT 654–55. Maltz acknowledged at the *Sparman* hearing the content of the statement he had tried to elicit—and that he had failed to adduce by calling the declarant nurse herself. Specifically, according to a contemporaneous report prepared by Officer Burrell on the same day that the Victim was

found in the playground, the nurse had stated that the Victim told her that the assailant "forced his penis into her vagina *after beating her* about the head and face with his fists and kicking her." PX 6 (emphasis added; capitalization removed). Maltz, however, made no effort to contact the nurse to testify at trial. *See* ET 58–61.[44]

### b *Jagpal's Testimony*

On the subject of the admission of Jagpal's grand jury testimony, Maltz recalled that the trial court had cited the specific statute that governed the matter, N.Y.Crim. Proc. Law § 60.35. Asked about his knowledge of that statute, Maltz testified, "I am much more aware of the statute now, but I was reading it with him at the sidebar." ET 70. Maltz claimed to have been "familiar" with the statute, but not "specifically well versed in" it. ET 71. When I tried to get a more precise explanation of the extent to which he had previously encountered the statute, Maltz gave answers that I can only characterize as evasive. Based on his answers at the *Sparman* hearing, my impression is not only that Maltz had little if any understanding of the statute at the time of Gueits's trial, but that he continued to misunderstand it when he appeared before me. In particular, he seemed unable to appreciate the critical significance, for purposes of admissibility, of whether Jagpal's trial testimony was neutral rather than contrary to the State's position at trial.

---

**42.** Indeed, Maltz conceded that when the prosecutor called Detective Porter to elicit Gueits's statement, it "didn't occur to [him]" that the prosecutor's strategy might be to prove consciousness of guilt. ET 52.

**43.** In addition to the evidentiary value to the defense of the DNA analysis linking the rape to a black man, Maltz acknowledged another concern that would have been addressed by the introduction of such evidence. Maltz

agreed that he was "concerned that black jurors would find it particularly offensive if they believed [his] client made up a black man to pin the crime on." ET 53.

**44.** If, as the Victim reportedly said to the nurse, the rape occurred *after* the beating, then Jagpal's testimony as to the timing of the events she recalled would have been less likely.

ET 70–77; *see also* ET 79 ("I didn't think there was anything inconsistent with her testimony at the grand jury.").

Whether he understood the statute or not, at the trial or at the *Sparman* hearing, it is apparent that Maltz's failure to make a correct argument against the admission of Jagpal's grand jury testimony was not the result of any strategic decision. Maltz acknowledged that he viewed Jagpal's trial testimony about her inability to identify the Victim's assailant as essentially neutral. ET 69. He further acknowledged that he did not make the specific argument that Jagpal's grand jury testimony was inadmissible precisely because it was neutral and therefore did not damage the People's case. ET 73. Maltz did, however, make every argument that he could think of to counter the prosecutor's effort to admit the impeachment evidence—just not the correct one.

Maltz also appears not to have understood—at least during the trial, and even at times during the *Sparman* hearing—the proper limitations on the use of the impeachment evidence once it was admitted. Although he argued at Gueits's sentencing hearing that the trial court improperly allowed Jagpal's grand jury testimony to be introduced as evidence-in-chief, *see* ET 79 (quoting ST 3), Maltz stated that during the trial he "never thought of th[e] question" of whether the jurors might make such improper use of the impeachment evidence. ET 79.[45] Relatedly, when asked why he had made an argument in his summation that plainly suggested that the jury *could* consider Jagpal's grand jury statement identifying Gueits as evidence-in-chief, ET 80,[46] Maltz answered that he did not know, that it was not a conscious decision, and that he had focused instead on the issue of reasonable doubt. ET 80–81.

On the other hand, Maltz recalled that he had objected "throughout the entire

**45.** That Maltz continued to misperceive the significance of the issue is reflected by the comment he made after saying that he "never thought of" the matter during the trial. Maltz interrupted the next question and asked for an opportunity to "elaborate" on the statement that he had "never thought of" the risk that Jagpal's impeachment might improperly be used as evidence-in-chief:

> I thought between the condition of this victim at the trial, a sympathetic woman that had her injuries, and I thought Jagpal was not the most important witness. She was essential, but it was the overall picture. I mean, just look at Jagpal alone as part of this case. There were a lot of pieces to the puzzle which made it difficult for me to think about her alone, but she had was [sic] an essential witness . . . if that answers your question.

ET 80. For an attorney who appreciated the distinction between the proper and improper uses of impeachment, Maltz's effort to "elaborate" on his answer by minimizing the importance of Jagpal's testimony would have been a *non sequitur.* Moreover, the proposition that

"Jagpal was not the most important witness" is incomprehensible: she was the only percipient witness whose testimony (albeit in a form that the jury should never have heard) directly inculpated Gueits.

**46.** Gueits's habeas counsel did not quote the precise argument to which she was referring. It appears to have been the following, in which Maltz plainly attacked the reliability of the contents of Jagpal's grand jury testimony rather than addressing its value only as impeachment of Jagpal's trial testimony (which he in any event asked the jury to credit): "And when [Jagpal] testified before the grand jury, I submit to you she was mistaken and confused because it is impossible for her to see anybody in that handball court." TT 703; *see also* TT 698 (arguing that Jagpal's trial testimony—in which she said she could not identify the Victim's assailant—was "more truthful" than testimony she gave at "any other time"); TT 700 (argument questioning whether Jagpal's grand jury testimony was "truthful" or "not truthful"); TT 706 ("I submit to you that she could not and did not see Mr. Gueits hit [the Victim].").

[prosecution] summation," which objections ostensibly included challenging the prosecutor's repeated references to the content of Jagpal's grand jury testimony. ET 81.[47] Nevertheless, Maltz acknowledged that he failed to request a limiting instruction as part of the court's charge to the jury, and even expressed his regret that he had not done so. ET 81–82. When asked to explain the lapse, Maltz gave the following answer:

I thought the Judge was going to bring it up. And we had a charge conference, and I—at the moment, because of the moment, I thought that maybe he was going to include it. Since 64.30[sic] was a major issue during the trial, he said he would include it.

ET 82. Maltz did not explain why, when the judge did not raise the matter *sua sponte* at the charge conference or include a limiting instruction *sua sponte* in his jury charge, he did not take any affirmative step to ask for such an instruction.

Maltz also had no explanation for his failure to seek a correction of the portion of the jury charge that erroneously re-ferred in the plural to identification witnesses. As Maltz testified, the only identifications in the trial record were the Victim's head-shake in response to Officer Burrell's testimony and the statements in Jagpal's grand jury testimony that were admitted as impeachment. ET 83–85. Although the latter plainly did not qualify as an identification by a witness, Maltz did not object when the judge repeatedly instructed the jury on the proper way to consider the identification testimony of multiple "witnesses." That lapse was apparently not the result of any tactical decision or strategic judgment, Maltz simply did not know why he didn't correct the error. *See* ET 85–87.

### c. *Failure To Preserve Objections To Alleged Prosecutorial Misconduct*

Maltz testified that there were numerous instances in which he believed the prosecutor made improper arguments during the summation, and that he raised objections to such arguments. ET 88. His testimony was inconsistent as to

---

**47.** To the extent Maltz meant only that he had objected during the summation, he said nothing about whether he objected specifically to the use of the grand jury testimony as evidence-in-chief. On the other hand, if Maltz meant to suggest that he did lodge such specific objections, his recollection of his own performance was overly generous. When the prosecutor first asked the jury during his summation to consider as evidence-in-chief a statement that Jagpal had made in the grand jury, Maltz did object. However, he did so on the incorrect ground that the statement had been precluded rather than on the correct one that it had been admitted for a limited purpose:

MR. MALTZ: Objection.
THE COURT: Overruled.
MR. FERINO: That is what the testimony was. That is what she said in the grand jury, it is what she said here.
MR. MALTZ: Objection to what she said in the grand jury. Precluded her testimony.

THE COURT: Overruled. You remember the testimony of evidence and rely on your recollection, please.
TT 731. Moreover, at each of the several later points in the summation when the prosecutor relied on the substance of Jagpal's grand jury testimony, Maltz made no objection at all. *See* TT 732 (no objection to use of Jagpal's grand jury testimony about the number of times Gueits kicked the Victim); TT 737 (no objection to use of Jagpal's grand jury testimony about identifying Gueits to the police during the 911 call); TT 738–39 (same); TT 743 (same); TT 745 (no objection to implicit use of Jagpal's grand jury testimony about identifying Gueits as the assailant by arguing that crediting Gueits's exculpatory statement would require the jury to believe that another person looked so much like Gueits as "to fool Sunnita Jagpal").

whether he knew at the time that, in order to preserve each objection for appellate review, he was required to do more than say the single word "objection," but instead had to state the basis for the objection.[48] Whether he was aware of that requirement or not however, Maltz acknowledged that in several instances he had failed to satisfy it, and that he had instead simply made one-word objections. ET 88–91. Maltz likewise acknowledged that he failed to seek a mistrial on the basis of the perceived prosecutorial misconduct, and that in retrospect he should have done so. ET 91. Maltz's only explanation was an inapposite observation that the court had gone "right into summations" and had not given the parties "a chance to make objections." ET 91.[49]

### d. *Maltz's Assessment Of His Own Conduct*

Consistent with the *Sparman* opinion's injunction that "a district court facing the question of constitutional ineffectiveness of counsel should ... offer the assertedly ineffective attorney an opportunity to be heard," 154 F.3d at 52, after the parties' counsel concluded their examinations I offered Maltz a chance to speak on his own behalf. Maltz summarized his training and experience, and made clear his commitment to staying current with legal developments as well as the strong commit-

ment he felt to his client in this case. On the other hand, Maltz said,

> ... I did make mistakes on this case. I realize I did. I don't know if it is monumental or fundamental enough to deprive the defendant of the ineffective [sic] assistance of counsel.... I don't know if I reached of [sic.] the point of the Strickland level. I worked very hard. I could understand if I had bailed on my client. I don't think that I did.

> If you should find that I was derelict, you have to understand the circumstances of this case; that trying this case was very stressful. A lot of time at work. A lot of time at home. A lot of time on the phone.... I didn't call Maryland. You are right, I didn't. And 60.35, maybe I made a mistake there.

> And the Judge telling the jury about the witnesses, you know, it didn't feel well. Or maybe I thought it could be typographical or maybe it was a mistake in calling the witnesses.

ET 113–14. Following that statement, to ensure a clear record, I asked Maltz "were there any strategic decisions that I haven't heard about today on these issues about Ms. Jagpal's testimony [or] the jury instructions[.]" Before I could finish the question to include other matters raised in the petition, Maltz answered in the nega-

---

48. *See* N.Y.Crim. Proc. Law § 470.05(2); *see also, e.g., Garvey v. Duncan*, 485 F.3d 709, 714–15 (2d Cir.2007) (citing New York state cases holding that general objections are insufficient to preserve issues for appellate review, including cases decided before Gueits's trial).

49. The explanation was incorrect as well as inapposite. The trial judge engaged in extensive colloquy before bringing the jury in to hear summations. TT 669–88. Even after the jury entered and heard that summations were about to begin, the court paused for

further colloquy. TT 689–90. At the end of the defense summation, the court called a recess. TT 725. Finally, while the court did begin the jury charge immediately after the end of the prosecution's summation, TT 745, it also explicitly gave Maltz an opportunity to note any exceptions or make any requests immediately after the charge was completed. TT 774. Thus, if Maltz intended to convey that he had not had an adequate opportunity to seek a mistrial based on prosecutorial misconduct *after* the summations, he was demonstrably incorrect.

tive.[50]

## II. *Discussion*

The court must address three legal issues in determining whether the record described above suffices to entitle Gueits to habeas relief. It must first decide whether Gueits has properly preserved for collateral review his claim that he was denied his Sixth Amendment right to the effective assistance of counsel, as well as each sub-claim describing a particular aspect of the purported ineffectiveness. To the extent he has done so (and the respondent does not take issue with the procedural viability of at least some of Gueits's arguments), then the court must determine whether Gueits has presented a claim that has substantive merit under the controlling standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and subsequent case law. Finally, even if Gueits has succeeded in showing that his counsel was constitutionally ineffective, he must still demonstrate that the state courts of New York erred in their rejection of that claim to an extent that permits this court to overcome its normal deference to such a determination. I outline the law applicable to each point, and the merits of each, in turn below.

### A. *Procedural Default*

As noted above, the respondent contends that three of the five sub-claims of ineffectiveness have not sufficiently been preserved for review, but tacitly concedes that at least two sub-claims are properly before this court. Specifically, the respondent argues that Gueits has procedurally defaulted only on the sub-claims involving

Maltz's failure (1) to make the correct legal argument in opposition to the admission of Jagpal's grand jury testimony (the second sub-claim in the petition); (2) to object to the prosecutor's injection of his personal credibility into the examination of Jagpal (the fourth sub-claim); and (3) to object to the prosecutor's several improper statements during summation (the fifth sub-claim). The respondent does not oppose consideration of the merits of the sub-claims involving Maltz's failure to secure and present DNA evidence demonstrating that, consistent with Gueits's account to the police, the Victim was raped by a black male (the first sub-claim), nor does he make such an argument with respect to the sub-claim involving Maltz's failure to insist on the correct limitation of the improperly admitted impeachment material (the third sub-claim).

As a result, I discuss in detail below the exhaustion requirement only with respect to the second sub-claim, involving the admission of Jagpal's impeachment. I do not analyze in detail the exhaustion requirement with respect to the claims involving prosecutorial misconduct for two reasons. First, as set forth below, I conclude that the first three sub-claims easily suffice to entitle Gueits to habeas relief. Second, and perhaps more important, I conclude that neither the fourth sub-claim nor the fifth, standing alone, would warrant relief even if properly preserved. Each involves a claim of prosecutorial misconduct deeply intertwined with the evidence admitted during Jagpal's appearance on the witness stand and the proof (and lack thereof) concerning the DNA analysis of samples recovered from the Victim; as a result

---

**50.** The only exception that Maltz noted in this regard was the possibility of a strategic decision not to call his client as a trial witness. ET 115. The instant petition does not include that decision—which was all the more questionable in light of the fact that Maltz promised the jury in his opening statement that Gueits would testify, TT 292—as a basis for finding that Maltz was ineffective, and I do not discuss it further below.

they add no weight to the petition that it would not already have if it included only the first three sub-claims. In other words, if, for example, Maltz had made the correct argument to preclude the admission of Jagpal's impeachment—or, failing that, if he had simply secured the proper limiting instruction—his failure to object to the prosecutor's repeated reliance on that impeachment as evidence-in-chief would likely not constitute ineffectiveness under applicable law. Likewise, had Maltz done his job by introducing evidence that there was a specific black male whose DNA had been found not only in the Victim in this case, but also in the victim of the Maryland rape, the failure to object to the prosecutor's willfully false argument that Gueits had tried to pin the crime on a "mysterious" black man, TT 742, would not have been likely to change the outcome because the jury would have had the ability to see it for the fraud that it was—or more likely, the prosecutor would have been dissuaded from making that entirely inappropriate argument in the first place. Accordingly, I conclude that the court can properly dispose of this case on the merits regardless of the outcome of any analysis of the respondent's contention that the fourth and fifth sub-claims are procedurally barred.

### 1. *Applicable Law*

A state prisoner must normally exhaust the remedies available to him in state court before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b); *see Jimenez v. Walker*, 458 F.3d 130, 148 (2006) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)). The latter requirement promotes the interest of comity between the federal government and the states by ensuring that state courts are given the first opportunity to consider, and in appropriate cases remedy, alleged violations of their prisoners' federal rights. *See id.* at 148–49 (citing *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)); *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir.2005) (citing *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Moreover, a prisoner cannot short-circuit such state court review by failing to present the full claim for relief that he will later make in a habeas petition; instead he must "fairly present" his federal constitutional claims to the state courts. *See Jackson*, 404 F.3d at 618 (citing *Picard*, 404 U.S. at 275, 92 S.Ct. 509); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 124 (2d Cir.1995). In other words, the claims presented by a petitioner to the State appellate courts must be the "substantial equivalent" of the claims raised in the federal habeas petition. *Picard*, 404 U.S. at 278, 92 S.Ct. 509.

It is not enough, for purposes of this exhaustion requirement, for a prisoner simply to include in his attempts to secure state court relief a recitation of all of the facts underlying the federal claim, nor does the assertion of a somewhat similar state-law claim suffice to preserve a claim under the federal Constitution. *Smith v. Duncan*, 411 F.3d 340, 349 (2d Cir.2005) (citing *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)). In the context of a claim of ineffective assistance of counsel, a petitioner may not seek habeas review of any specific factual complaint about his counsel that he did not fairly present to the state courts. *See Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991). On the other hand, a federal court need not dismiss a habeas petition where an additional factual claim not made in the state courts does not "fundamentally alter" a properly preserved ineffectiveness claim but instead "merely supplement[s]" it. *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir.1994). Indeed, "the Supreme Court

has warned against interpreting this provision [requiring exhaustion of state remedies] too narrowly, holding that it requires 'only that state prisoners give state courts a *fair* opportunity to act on their claims.'" *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir.2005) (quoting *O'Sullivan*, 526 U.S. at 844, 119 S.Ct. 1728 (emphasis in original)), *cert. denied*, 544 U.S. 1025, 125 S.Ct. 1996, 161 L.Ed.2d 868 (2005).

■ A defendant convicted of a crime in New York must take two steps to exhaust "one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728. He must first appeal his conviction to the Appellate Division; if he fails to secure relief at that stage, he must then seek further review of the conviction by applying to the Court of Appeals for a certificate granting leave to appeal. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir.2000), *cert. denied*, 531 U.S. 819, 121 S.Ct. 59, 148 L.Ed.2d 26 (2000); N.Y.Crim. Proc. Law § 460.20 (McKinney 2007). The application for leave to the Court of Appeals may be in letter form. 22 N.Y. Comp.Codes R. & Regs. § 500.20(a) (McKinney 2007). New York Court rules require that leave applicants submit to the Court of Appeals briefs and other documents from the lower courts and that "[p]articular written attention shall be given to ... identifying and reproducing the particular portions of the record where the questions sought to be reviewed are raised and preserved." *Id.*[51]

2. *Exhaustion Of State Remedies*

■ In seeking direct review of his conviction in the state courts, Gueits twice asserted that he was denied the effective assistance of counsel: first to the Appellate Division of the Supreme Court, and then again in seeking leave to appeal the affirmance of his conviction to the Court of Appeals. At each stage of that process, Gueits explicitly claimed that he had been denied his right to the effective assistance of counsel, and just as explicitly stated that one of the ways in which he was deprived of that right was by virtue of Maltz's failure to articulate the correct objection to the admission of Jagpal's grand jury testimony under Section 60.35.

In the portion of his brief to the Appellate Division in which he asserted the Sixth Amendment violation, *see generally* App. Div. Br. 63–69, Gueits argued that Maltz's effort to oppose the admission of the impeachment "was so confused and inept as to suggest that he was totally unfamiliar with the statute involved and never even bothered looking at it when the issue arose[.]" App. Div. Br. 69 (citing TT 439–43). He immediately went on to argue that "[b]ecause counsel blundered badly as to the only real issue in the case," the trial was rendered "fundamentally unfair to [Gueits] and its outcome unreliable." *Id.* Such argument and citation to the record, standing alone, unquestionably fairly presented the Appellate Division with the sub-claim Gueits seeks to litigate here. But the argument did not stand alone: earlier in his brief, Gueits provided a detailed argument about why the admission of the impeachment was substantively erroneous. App. Div. Br. at 42–45 & n. 17. On this record, there can be no reasonable dispute that the Appellate Division had a fair opportunity to consider and remedy Maltz's unreasonable and prejudicial failure to explain why Jagpal's grand jury testimony could not properly be admitted.

51. When Gueits filed his application for leave to appeal in November 2004, the applicable provision was New York Court Rule § 500.10(a). That provision was later repealed and replaced by a new provision with a different number but substantively similar requirements. *See* 22 N.Y. Comp.Codes R. & Regs. § 500.20(a) (McKinney 2007).

Likewise, in his letter seeking leave to appeal his conviction to the Court of Appeals, Gueits wrote that Maltz had objected to the admission of Jagpal's grand jury testimony as impeachment but that he "was confused about, and indeed appeared completely unfamiliar with, [N.Y.] Crim. Proc. Law § 60.35." Leave App. 5. To be sure, that particular criticism of counsel appeared in a lengthy section of the letter that raised the substantive evidentiary error directly rather than the derivative Sixth Amendment violation that Gueits now raises here. *See* Leave App. 3–5. But Gueits returned to the issue within the portion of his letter that explicitly complained of the ineffectiveness of his trial counsel. Specifically, Gueits argued that Maltz's "investigation and use of the law was as deficient as his investigation and use of the exculpatory facts.... Counsel knew before opening statements that the People were relying on a reluctant eyewitness whom they might well want to impeach ... but he completely failed to familiarize himself with [N.Y.] Crim. Proc. Law § 60.35." Leave App. at 7 (citing TT 268, 269). In the same section of his letter, Gueits asserted that Maltz "made the wrong arguments against impeachment[.]" Here again, this record standing alone would suffice to give the Court of Appeals a fair opportunity to consider and remedy the claim now before this court—and here again, there was more to alert the court to the presence of the issue in the case. As he did in his brief to the Appellate Division, Gueits made it perfectly clear in his letter to the Court of Appeals that he was including in his ineffectiveness claim not only the arguments about the DNA evidence and the failure to secure a limiting instruction on the proper use of Jagpal's impeachment, but also the other "blun-

ders" that had resulted in other substantive trial errors. Leave App. at 9, *see also* Leave App. at 1 (using the term "*inter alia*" to signal that Gueits was relying on more theories of ineffectiveness than the two sub-claims discussed at greatest length in his letter).

I conclude that Gueits fairly presented each of his first three sub-claims of ineffectiveness to both the Appellate Division and the Court of Appeals, and that he therefore exhausted his opportunities for state court review of those matters. As a result, I respectfully recommend that the court consider the merits of those sub-claims.

### 3. *Alternative Procedural Analysis*

■ In light of my conclusion that Gueits has sufficiently exhausted three sub-claims that warrant substantive relief, I do not analyze in this report whether any failure to exhaust a sub-claim (either as to the three I consider below on the merits or the two I do not) could properly be excused under the "cause and prejudice" or "miscarriage of justice" exceptions to the exhaustion requirement. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 485–86, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (recognizing cause-and-prejudice exception); *Washington v. James*, 996 F.2d 1442, 1447 (2d Cir.1993) (recognizing "fundamental miscarriage of justice" exception). To be sure, there are substantial arguments to be made on both scores. With regard to the former, the fact that the state courts found Gueits to have forfeited review of his complaints about the admission of Jagpal's impeachment while at the same time ignoring the merits of that claim might well justify consideration of the merits of the related sub-claim of ineffectiveness.[52]

---

**52.** The respondent argues that Gueits should be "estopped" from citing Maltz's failure to preserve the improper impeachment issue as evidence of his ineffectiveness on the ground

With respect to the "fundamental miscarriage of justice" exception, Gueits might also have a sufficient argument—particularly on the basis of facts that the State has had at its disposal since before this habeas case began but that Gueits's counsel and I did not learn until several months later. Based only on the facts that were available during the state proceedings—in particular, the fact that the DNA recovered from the Victim excluded Gueits and matched the DNA recovered from another rape victim who described her assailant as a black man, combined with the Victim's account of having been raped and assaulted by the same man and Gueits's account of having seen a black man attack the Victim—there is a very real possibility that the ineffectiveness of Gueits's trial counsel resulted in the conviction of a man who is actually innocent. That possibility is rendered all the more troubling by the fact, revealed during these proceedings, that the State has persistently failed to take advantage of its ability to investigate the man who was eventually identified as the source of the DNA found in both rape victims—a man whom it had in custody when the instant petition was filed and then released on parole before letting Gueits's counsel know that he had been identified.

As discussed above, prior to trial the prosecutor learned from the Baltimore Police Department, and in turn informed Maltz, that the DNA found in the Victim matched the DNA recovered from a 13-year-old girl in Maryland who had also been raped. As the prosecutor knew and told Maltz, the Maryland rape victim had described her attacker as an African-American—consistent with the description that Gueits had given of the man whom he saw attack the Victim in this case. See TT 2, 676–77; ET 18. Thus, at the time of Gueits's trial and conviction, both parties knew that the donor of the DNA recovered from the Victim was a black man, but neither party knew that man's identity. After these habeas proceedings began, Gueits's new counsel subpoenaed records from the Baltimore Police concerning the Maryland rape case. Those records, produced on February 20, 2007, revealed that the prosecution had more specific evidence about the unidentified DNA donor available as early as the time of the trial, and had his name—and had the man himself in custody in a New York State prison—before Gueits filed his habeas petition.

Specifically, the Maryland rape victim reported that she had gone out with two girlfriends, and that a man named "Mike"—the boyfriend of the mother of one of the other girls—had taken all of them to someone's home, where they all started drinking. When the girl started

---

that he argued in the state courts that the substantive evidentiary issue *had* been sufficiently preserved. *See* Opp. 53. He cites no authority for that proposition, which wholly misperceives the doctrine of judicial estoppel. A party seeking to estop an opponent from making an argument on such grounds must not only show that the adverse party has "advanced an inconsistent position in a prior proceeding," it must also show that "the inconsistent position [was] adopted by the court in some matter." *Peralta v. Vasquez,* 467 F.3d 98, 105 (2d Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 3006, 168 L.Ed.2d 726 (2007); *see also Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895) (requiring "prejudice of the party who has acquiesced in the position formerly taken by" his opponent); *OSRecovery, Inc. v. One Groupe Int'l, Inc.,* 462 F.3d 87, 93 n. 3 (2d Cir.2006) ("judicial estoppel ... is designed to protect the integrity of the judicial process"); *In re Holocaust Victim Assets Litigation,* 2007 WL 805768, at *11 (E.D.N.Y. Mar.15, 2007) (doctrine of judicial estoppel "protects judicial integrity by requiring something more than just a court's acknowledgment of the prior inconsistent position; namely, an adoption that makes the position part of the court's own action").

vomiting from having had too much to drink, "Mike" and another man described as African–American (and later identified as the donor of the DNA recovered from the Victim in the instant case) took her up to a bedroom. The second man left, and "Mike" raped the girl. After "Mike" left the room, the second man re-entered and also raped the girl. The victim provided physical descriptions of both men. Baltimore police identified "Mike" (whose true name appears in their records) and obtained a warrant for his arrest, but were initially frustrated in their attempts to find him. Their investigation revealed that, as of late March 2000, "Mike" had fled to Queens, New York, where he had a former residence and several relatives. "Mike" was eventually arrested on May 2, 2000.[53] On March 11, 2002 a routine search by the Maryland State Police Crime Laboratory of the "CODIS" national DNA database revealed a match between the samples recovered from the respective victims of the Maryland case and the one at issue here.[54]

Accordingly, anyone with access to the Baltimore police reports about the case that were available in advance of Gueits's trial would have known that at least one of the two alleged rapists in the Maryland case had connections to Queens, New York—where the rape in this case took place—and that that man was in police custody while the second man, whose DNA matched the evidence in the instant case and who apparently had a connection with the man in police custody, was still at large.

On October 24, 2005—after Gueits had exhausted his opportunity for state court review but months before he filed the instant habeas petition—a Baltimore Police detective contacted a New York City Police detective to provide further information. The donor of the DNA sample matching both the Maryland rape and the rape in this case had been identified—and the Baltimore detective passed along to his New York counterpart the donor's name and New York Identification number. PX 4, Baltimore Police report dated Oct. 24, 2005. The latter identifier was available because the man so identified was at that time an inmate in a New York State prison. *See* PX 4, Maryland State Police Report dated Oct. 10, 2005.

Upon learning that the Victim's apparent rapist was in New York State custody, neither the police nor anyone involved in Gueits's prosecution made any effort to interview the man or to investigate his role in the attack on the Victim—despite the fact that since the rape charge against Gueits was dropped, that crime has presumably remained unsolved. Nor did the State authorities notify Gueits of the development, either at the time they learned of it, or when, several months later, Gueits filed his habeas petition. Instead, during the period in which Gueits's habeas counsel was awaiting the production of records from Maryland—records reflecting information the New York police already had— the State of New York released the apparent rapist on parole without having made any attempt to question him about the

---

**53.** The record does not reveal the aftermath of that arrest. However, a search of Maryland's sex-offender registry (using the real name set forth in PX 4) reveals that "Mike" was convicted of rape in the second degree and categorized as a Child Sexual Offender. *See* Maryland Sex Offender Registry Search, http://www.dpscs.state.md.us/sorSearch/ (last visited Aug. 8, 2008).

**54.** It was apparent that "Mike" was not the donor of the matching DNA: he was already in custody, and the Maryland records disclose that as of the time of the match "[n]o suspect ha[d] been located in reference to the DNA match." PX 4, Baltimore Police report dated Mar. 18, 2002, at 3.

Victim's rape in the roughly 17 months since being told of the DNA match by the Maryland authorities. New York police finally attempted to locate and interview the apparent rapist—without success, at last report—only after my repeated inquiries into the matter during these proceedings. *See* AT 5–6; DE 19.

In my view, the foregoing facts about New York State's reluctance to investigate the Victim's rape are irrelevant to the resolution of the instant petition because I conclude that Gueits sufficiently exhausted his opportunities to seek review in the state courts of the first three sub-claims of his habeas petition. But to the extent the respondent (or, more pertinently, the court) disagrees with that analysis, the facts revealed by the Maryland documents become more relevant. Even without them, there may be a basis for excusing any procedural default to avoid the manifest injustice of continuing to incarcerate a prisoner who may be actually innocent of the assault for which he was convicted—the trial record alone suffices to raise that possibility. But the addition of the facts revealed by the subpoenaed Maryland documents begs the question of why New York State has been so reluctant to take easily available action to investigate a man in its custody with respect to his apparent role in a rape for which no one has ever been convicted. I can see no legitimate reason for that reluctance.[55] Nevertheless, I must in fairness hasten to add that there is also no direct, affirmative proof in the record that the State's reluctance in

this regard is attributable to an improper motive to forestall the development of further evidence that might bolster the proposition that Gueits is actually innocent. Whatever the motivation for the state's perplexing diffidence, the result is an increased likelihood that Gueits might, if the need arose, be excused for a procedural default.

B. *Gueits Was Denied The Effective Assistance Of Counsel*

1. *Applicable Law*

■ The constitutional right of the accused to "the Assistance of Counsel," U.S. Const. amend. VI, "has long been recognized to guarantee the effective assistance of counsel," *Greiner v. Wells,* 417 F.3d 305, 318 (2d Cir.2005) (citing *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)) (internal quotation marks omitted). That guarantee applies to the States as a component of due process under the Fourteenth Amendment. *See Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Greiner,* 417 F.3d at 318. Thus, when "a State obtains a criminal conviction in a trial in which the accused is deprived of the effective assistance of counsel, the State ... unconstitutionally deprives the defendant of his liberty," rendering the accused "in custody in violation of the Constitution." *Kimmelman v. Morrison,* 477 U.S. 365, 383, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 64 L.Ed.2d

**55.** To the extent that, once the matter came up in these proceedings, the respondent's counsel asserted that the police had wanted to interview the Victim before seeking to interview her apparent rapist, the response does not explain why the police took no action *before* Gueits filed his habeas petition. At the initial appearance before me, the respondent's counsel indicated that he was at that

point unaware of any effort that had yet been made to locate the Victim. *See* ICT 17–18. It was only in response to my request that counsel make such an effort and notify the Victim of her rights under the Crime Victims Rights Act, *see* 18 U.S.C. § 3771(a), (b)(2)(A), that the police learned that they were unable to locate her. *See* ET 6–7.

333 (1980)) (internal quotation marks omitted).

A defendant seeking relief on the ground that his trial counsel was ineffective must make two showings: that his counsel's performance was unreasonably deficient, and that the deficiency prejudiced him. *See generally Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001). More specifically, the defendant's first challenge is to show that his counsel's performance fell below an "objective standard of reasonableness" compared to "prevailing professional norms." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. The second element requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Id.* at 694, 104 S.Ct. 2052; *see also Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. However, "[t]he result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Henry v. Poole*, 409 F.3d 48, 64 (2d Cir.2005) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir.2003). I examine each component of Gueits's *Strickland* claim in turn.

2. *Counsel's Performance Was Unreasonable*

■ In evaluating the performance component of the *Strickland* test, the court must assess "the reasonableness of trial counsel's actions under all the circumstances ... from the perspective of trial counsel at the time." *Greiner*, 417 F.3d at 319 (internal citations and quotation marks omitted). In doing so, the court must consider "the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts." *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir.2008) (denying the defendant's ineffective assistance claim because he failed to show "that it was objectively unreasonable not to bring a motion to dismiss on Speedy Trial Act grounds."). Considerable deference is accorded to counsel's performance, as counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

■ As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," although strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052. Hence, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. More specifically, "[i]n assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the

known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The court generally presumes that lawyers conduct adequate investigations, unless the record reflects otherwise. *See, e.g., Foreman v. United States*, 247 Fed.Appx. 246, 248 (2d Cir.2007). Counsel need not pursue investigations that will undermine the defendant's primary defense tactic. *Denby v. Comm'r of Correction*, 234 Fed.Appx. 1, 2 (2d Cir.2007). Despite such presumptions of deference, however, "if certain [acts or] omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, [a court may] find the quality of representation sufficiently deficient to grant the writ." *Eze*, 321 F.3d at 112; *see also Mickens v. United States*, 257 Fed.Appx. 461, 462–63 (2d Cir.2007) (failing to deliver a plea offer to a client clearly satisfies the first step of the *Strickland* test), *cert. denied*, —— U.S. ——, 128 S.Ct. 2069, 170 L.Ed.2d 796 (2008).

The kinds of omissions that can render an attorney's performance unreasonable are not limited to those that result from "oversight, carelessness, ineptitude, or laziness"—some lapses can be so objectively unreasonable that they constitute unreasonable performance regardless of the reason for the omissions. *See, e.g., Bell v. Miller*, 500 F.3d 149 (2d Cir.2007) (defense counsel constitutionally ineffective for failing to consult medical expert regarding

reliability of shooting victim's identification). Failing to explore expert testimony that would impeach the testimony of the sole identifying witness "cannot fairly be attributed to a strategic decision[,]" especially when doing so "could have vastly increased the opportunity to cast doubt on ... critical evidence." *Id.* at 156 (quotations and citations omitted). Even if the court finds that counsel cross-examined a key witness in an effort to create doubt about the witness' identification of the defendant, "handicapp[ing]" the cross examination by failing to adequately investigate constitutes ineffective assistance—particularly where the lapse undermines the "strategic lines" pursued at trial and the omission does not result from an explicit tactical decision. *Id.* at 156, 157.

In evaluating the instant claim of ineffectiveness, I note that this is not a case in which trial counsel thoroughly failed to perform the function of a defender. *See, e.g., Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir.2001) (finding ineffective assistance of counsel in part because the defense counsel "opted not to prepare a defense"); *Lindstadt*, 239 F.3d at 201 (granting writ where defense counsel failed to challenge the prosecution's only physical evidence). Gueits makes no such claim and indeed, the trial judge stated—albeit only after the trial was over, when Maltz first raised the prospect that his client was dissatisfied with his representation—that Maltz was "extremely diligent in [his] representation" and that he "never saw a lawyer try any harder...." ST 15.[56] Nevertheless, as

---

[56] However much the passage of time (or the specter of an ineffectiveness claim) may have burnished Maltz's image in the court's eyes, it is clear that the attorney made a rather less favorable impression on the judge while the trial was actually in progress. Indeed, at various times during the trial the judge criticized Maltz's poor performance or stepped in to protect Gueits from its adverse effects—

including with respect to the same matters that Gueits now cites in his petition. *See, e.g.,* TT 441–42 (trial judge's observation that Maltz's various inapposite arguments against the admission of Jagpal's grand jury testimony—all made after the judge had read the applicable statute to Maltz—had "[n]othing to do with what I said"); TT 515 (trial judge's interruption of Maltz's cross-examination of

discussed below, Maltz did make a series of discrete errors that can only be characterized as unreasonable within the meaning of *Strickland*. Among other errors—and I concentrate here only on those that have individually been preserved as independent bases for habeas relief, notwithstanding several others that would also, if preserved, suffice to grant the writ—Maltz made at least the following three mistakes. First, he failed to secure or present to the trial jury available DNA evidence that would have corroborated Gueits's post-arrest exculpatory statement and undermined the evidence supporting his identification as the Victim's assailant. Second, despite having adopted the strategy of seeking to preclude the admission of Jagpal's testimony to the grand jury, Maltz failed to raise the proper objection that was supported by the record and that would have sufficed to achieve his goal. Third, once the impeachment evidence had improperly been admitted, Maltz compounded the error by failing to make a proper objection to the prosecutor's use of it as evidence-in-chief, failing to request a limiting or curative charge in that respect, and even affirmatively approving a jury charge that allowed the jury to make improper use of Jagpal's grand jury testimony.

a. *The Failure To Collect And Offer DNA Evidence*

■ There is no dispute that before the trial began, Maltz knew that the DNA found in swabs taken from the Victim on the day she was attacked not only excluded Gueits as the donor, but also matched the DNA recovered from another rape victim in Maryland. Maltz further knew, because he had been provided with certain

details from the relevant police reports from Maryland, that the earlier victim had described her attacker as an African–American male—consistent with the description that Gueits had provided to the police on the day of his arrest, before he knew of the results of the DNA analysis. Nor can there be any dispute that Maltz adopted a strategy of seeking to adduce proof of the latter facts at trial—he affirmatively asked for a stipulation to that effect. Maltz's testimony at the *Sparman* hearing confirmed that at the time of trial, he was fully cognizant of the importance of the DNA evidence both to corroborate Gueits's exculpatory statement to the police and to undermine the prosecution's affirmative case.

Despite recognizing the importance of the DNA evidence, Maltz made no effort to secure the evidence in admissible form or to get it admitted, other than to ask his adversary for a stipulation. Having failed to persuade the prosecutor to help him build the defense case, Maltz simply gave up—he had no back-up plan. At the *Sparman* hearing, Maltz's only explanation for this lapse was that he did not pursue getting the evidence admitted at trial because the judge expressed doubts as to its relevance. However genuine that recollection may have been, it is inconsistent with the established facts. The record makes clear that the trial judge did not express any view that the DNA evidence would be irrelevant until the start of the trial—to the contrary, before the trial started the judge explicitly stated his understanding that "the defense" would rest in significant part on the DNA evidence—evidence that Maltz then took no steps to collect or present. *See* TT 12–13 (court's statement

Officer Wilson to keep him from inadvertently opening the door to the show-up testimony without requiring the prosecutor to lay a proper foundation); TT 702 (trial judge's re-

minder to Maltz, in the midst of his summation, to introduce the stipulation that "Freddie" was not the source of the DNA found in the Victim).

to Maltz, one week before start of trial: "You have the DNA evidence ... [b]ased upon that the scientific nature of the evidence I will permit you to put th[e] defense forward ... that someone else raped the Victim ... even though it involves a crime not charged on the indictment, it is the defense.").

Maltz unreasonably failed to conduct an investigation that might have led to the admission of evidence corroborating Gueits's exculpatory statement. Maltz never telephoned the Baltimore police to speak with the police officers assigned to the case, nor did he attempt any other investigation that might lay a foundation for introducing the DNA evidence at trial. There is of course no guarantee that such efforts would have succeeded in getting the evidence before the jury, but in light of the trial court's expressed understanding of the defense, it seems probable that an explanation of the need for the evidence (*i.e.,* that it would corroborate Gueits's account and, taken together with evidence that the Victim stated she had been raped by the man who assaulted her, would have also undermined proof that Gueits committed the assault) would have persuaded the trial judge to admit it (or an appellate court that excluding the evidence was reversible error).[57] What is not subject to question is that Maltz could not know whether he would succeed in presenting the evidence, because he failed to conduct an adequate investigation or make any attempt (other than a vain request to the prosecutor) to secure its admission.

There is no way to view Maltz's failure in this regard as a strategic decision

to which the court must defer. Maltz recognized the critical importance of the evidence, and simply failed to take the reasonable steps necessary to advance a potentially powerful defense theory. This omission fell far below any objective standard of reasonableness.

b. *The Improper Admission Of Jagpal's Impeachment*

 Maltz's performance also fell below an objective standard of reasonableness with respect to the admission of Jagpal's grand jury testimony pursuant to Section 60.35 of the New York Criminal Procedure Law. There can be no reasonable dispute that the prosecutor had not established sufficient legal grounds to admit the testimony as impeachment of its own witness. Jagpal's trial testimony was neutral as to whether Gueits was the Victim's assailant; it did not tend to disprove the prosecution's position on that point or any other material fact. *See* note 23 *supra* (citing cases holding that a witness who testifies that she does not have knowledge as to a material fact does not disprove the sponsoring party's position for purposes of admission as impeachment under Section 60.35). Nor can there be any dispute that Maltz in fact adopted a strategy of trying to prevent the admission of Jagpal's grand jury statements under Section 60.35.

The only question that remains in the record is whether Maltz was simply unfamiliar with controlling law or misapplied it in making every objection but the correct one to the prosecution's offer to impeach its own witness. Maltz testified at the

---

**57.** In his zeal to oppose the instant petition, the respondent flatly misstates the record. Although the judge at one point near the end of the trial questioned the relevance of the DNA evidence implicating an African–American man in the Victim's rape, TT 677, it is simply not true that, as the respondent asserts, such evidence was "excluded by the trial court." Opp. 39. To the contrary, prior to the trial's start the judge explicitly assumed that Maltz would present such evidence and stated that he would be permitted to do so. *See* TT 12.

*Sparman* hearing that he was aware of Section 60.35 at the time of Gueits's trial, and that he viewed Jagpal's trial testimony as being essentially neutral. Taking Maltz's *Sparman* hearing testimony at face value, it would thus appear that Maltz knew everything he needed to know in order to make a proper objection to the admission of evidence he wished to preclude, and yet inexplicably failed to make it.[58] On the other hand, the trial record supports an alternate theory: that Maltz simply never grasped the critical missing requirement under the statute; namely, that Jagpal's trial testimony must have affirmatively tended to disprove the prosecution's case before the prosecution could seek to impeach her with her grand jury testimony.

Having viewed Maltz's testimony first hand, I tend to credit the latter explanation over the former. Even as late as the *Sparman* hearing, it was not clear that Maltz understood the mistake he had made in trying to object to the impeachment; further, I am persuaded that Maltz would not have simply withheld an objection that he recognized was available. Rather, I am convinced that Maltz simply made an error by failing to comprehend the way in which

Jagpal's testimony failed to satisfy the requirements of the applicable statute.

Either way, Maltz's performance must be deemed unreasonable. He either knowingly failed to make a correct objection to the admission of the impeachment, or failed to make that objection as the result of an unfamiliarity with the applicable law. There cannot be any other explanation—in particular, his failure to make the correct objection (while at the same time making a series of incorrect ones) cannot be ascribed to any strategic motivation, and Maltz made no such claim at the *Sparman* hearing. Maltz's conduct on this matter thus satisfies the first prong of the *Strickland* test.

### c. The Improper Use Of Jagpal's Impeachment As Evidence–In–Chief

There can be no dispute that Jagpal's grand jury testimony was admitted (albeit incorrectly) pursuant to a statute that limited its use to the impeachment of Jagpal's trial testimony, rather than as evidence-in-chief. Given that the impeachment evidence constituted the only statement by any witness at the trial that directly purported to identify Gueits as the assailant,[59] it should have been obvious to

---

**58.** As previously discussed, Maltz's testimony at the *Sparman* hearing was inconsistent as to whether he knew at the time of the trial that simply saying the word "objection," without an explanation of its basis, would not suffice to preserve an objection for purposes of appeal. Whatever he did or did not know on that score, it is clear that at many points during the trial Maltz made just that mistake in lodging objections, and that as a result the state courts refused to consider, among other matters, the merits of the claim that Jagpal's testimony was inadmissible.

**59.** To be sure, Burrell testified, when recalled to do so, that the Victim had shaken her head up and down in response to a question about whether Gueits "was the person who did this to her." TT 626. Leaving aside the fact that

her testimony in this regard was admitted as a result of yet another mistake by Maltz (who failed to object to the prosecutor eliciting a failure of recollection from the Victim after she had already testified to an ability to recall the person she had identified at the scene), Burrell was not permitted to say whether she understood the Victim's head-shake to be an affirmative response to her inquiry. As a result, unlike Jagpal's improperly admitted grand jury testimony, Burrell's testimony was not a direct identification of Gueits as the man who assaulted the Victim, nor even an indirect identification by means of hearsay; it was instead a piece of circumstantial evidence from which the prosecutor could argue his case. That such proof was of extremely limited use to the prosecution is not simply a matter of my opinion; the prosecutor demon-

Maltz that it was important to ensure that the jury was properly instructed about the limited purpose for which that evidence could be considered—namely, Jagpal's credibility. Not only did Maltz fail to do so, he affirmatively approved a jury charge that improperly permitted the jury to consider the impeachment as evidence-in-chief.

Unlike the two lapses described above—in which Maltz recognized a critically important goal of the defense and unreasonably failed to pursue it in an effective way—in this instance Maltz made *no* effort to prevent the jury from misusing Jagpal's identification of Gueits as evidence-in-chief. The court must therefore consider whether Maltz's action in approving the incorrect charge and his related omissions (failing to object to the incorrect charge or to the prosecutor's repeated improper suggestions that the jury consider the impeachment as evidence-in-chief) might have been the result of a tactical decision that deserves deference on collateral attack. The record makes clear, however, that Maltz made a mistake rather than a decision. First, there was simply no conceivable benefit for the defense in acquiescing in the improper use of the impeachment evidence. The respondent has identified no such potential benefit.[60]

Moreover, at the *Sparman* hearing, Maltz confirmed that his acquiescence in the misuse of the impeachment resulted from his failure to give the matter any thought at all. Maltz was asked if he was concerned that the jury—having been presented with Jagpal's grand jury testimony identifying Gueits as the assailant—might rely on that testimony as evidence-in-chief in its deliberations. He answered, "I don't know how to answer that question . . . . [b]ecause I never thought of that question. . . ." ET 79. Indeed, Maltz expressed regret at having failed to request a proper limiting charge, and explained that he had thought the judge would bring it up to the jury on his own. ET 81–82. Even taking the latter explanation at face value, it is insufficient for two basic reasons. First, whatever hopes Maltz might have had that the judge would provide a limiting charge *sua sponte*, he had an obligation to protect his client (and the record on review) when the prosecutor repeatedly misused Jagpal's grand jury statements in his summation. Second, it is unreasonable for a defense attorney to abdicate his constitutional duties to his client on the basis of a hope that an impartial judge will perform those duties for him. Third, once it was apparent that the judge had not only failed to give an appropriate limiting

---

strated a similar view in his summation. Although the respondent now asserts—directly contrary to the record he cites—that "Officer Burrell testified that the victim positively identified petitioner within minutes after the vicious attack, in the same playground where it occurred[,]" Opp. 45; *see also id.* 58–59 ("Officer Burrell . . . provided identification testimony" and "testified that the victim identified petitioner as the man who assaulted her"), the prosecutor facing the jury that actually heard Burrell's testimony made no such claim. Instead, he ignored the testimony entirely and understandably, if improperly, devoted the majority of his argument to Jagpal's statement to the grand jury. *See* TT 732–37, 745.

60. At the initial conference before me, the respondent's counsel opined that Maltz may not have requested a limiting instruction with respect to Jagpal's grand jury testimony because it would have been "of limited value" and "confusing to a jury." ICT 9. However, when pressed to explain how such confusion would have been contrary to Gueits's interests, counsel abandoned the argument and conceded that he was "not in a position" to identify any strategic goal that Maltz could have been pursuing by acquiescing to the misuse of Jagpal's testimony. *Id.* 9–12.

charge, but had affirmatively invited the jury to consider the evidence provided by "witnesses" who identified Gueits as the assailant, Maltz knew he could not rely on the judge to provide the correct instruction without prompting.[61] On this record, I must conclude that Maltz's acts and omissions with respect to the misuse of Jagpal's testimony constituted unreasonably poor performance that satisfies the first prong of the *Strickland* standard.

### 3. *Counsel's Defective Performance Was Prejudicial*

In evaluating the prejudice component of the *Strickland* test, a court looks to the "cumulative weight of error in order to determine whether the prejudice reaches the constitutional threshold." *Harris v. Artuz*, 288 F.Supp.2d 247, 256 (E.D.N.Y.2003) (quoting *Lindstadt*, 239 F.3d at 202). If the court concludes the same result would have obtained without counsel's alleged errors, it must deny the petition under the second prong of *Strickland*. *Bennett v. Fischer*, 246 Fed.Appx. 761, 764–65 (2d Cir.2007), *cert. denied*, — U.S. —, 128 S.Ct. 1722, 170 L.Ed.2d 527 (2008). Furthermore, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052). The thinner the case against the defendant, the greater the impact of counsel's error. *Miller*, 500 F.3d

at 155. The stronger the case, independent of the error, the less likely relief. *See, e.g., Hemstreet v. Greiner*, 491 F.3d 84, 92 (2d Cir.2007), *cert. denied*, — U.S. —, 128 S.Ct. 962, 169 L.Ed.2d 763 (2008).

As explained below, I conclude that the cumulative effect of Maltz's cognizable errors was prejudicial for purposes of the *Strickland* test. But I also recognize that the court may not accept my conclusion that each of the first three sub-claims Gueits has raised in his petition is sufficiently preserved for review or my conclusion that each satisfies the first prong of the *Strickland* test. I therefore begin by explaining my conclusion that each error, considered alone, sufficiently prejudiced Gueits to warrant habeas relief.

### a. *The Failure To Collect And Offer DNA Evidence*

█ As the trial judge recognized a week before the start of the trial, "the defense" that Maltz intended to assert on Gueits's behalf was that someone else committed the charged assault. A critical component of that defense was that Gueits did not simply assert that someone else must have committed the assault because he himself was innocent, but rather specifically asserted that he was a witness to the crime who had seen another man commit it. Together with the testimony that the Victim had contemporaneously told EMT Sawyer that the man who assaulted her

---

61. The respondent contends that the trial judge was not referring to Jagpal as among the witnesses whose testimony included an identification of Gueits as the assailant, and was instead referring to Burrell. Opp. 58–59. Such a reading is demonstrably wrong. As noted above, Burrell not only did not "testif[y] that the victim identified petitioner as the man who assaulted her[,]" Opp. 59, she was affirmatively prohibited from doing so by the very judge whom the respondent now contends had Burrell in mind in referring to

witnesses who gave identification testimony. *See* TT 626. The Victim herself affirmatively said that she did not see the man she had previously identified as her assailant in the courtroom, and then (when it became expedient for the prosecution to seek a different answer) testified that she could not identify her assailant at all. If any witness could be said to have identified Gueits as the assailant, it was Jagpal—albeit only by means of the improperly admitted (and misused) grand jury testimony.

also raped her, the collection and admission of DNA evidence that identified the assailant in this case as the same person described by another rape victim as a black man would have provided powerful corroboration—and therefore exculpation—for Gueits.[62] Without it, the prosecutor effectively—if improperly—mocked Gueits's statement to the police as a false exculpatory statement that demonstrated his consciousness of guilt by inventing a "mysterious" black man to blame for the crime. Moreover, the DNA evidence would also have undermined the reliability of Jagpal's grand jury testimony identifying Gueits as the assailant and Burrell's testimony regarding the Victim's head-shake. In short, there is at least a reasonable probability that if the jury had heard that Gueits had not invented the "mysterious" black man he described, but had instead voluntarily provided the police an accurate description of the assailant that

was later corroborated by DNA evidence, the jury would have had a reasonable doubt that would have resulted in an acquittal.

b. *The Improper Admission Of Jagpal's Impeachment*

■ If the prosecutor had not incorrectly been permitted to impeach Jagpal with her grand jury testimony, the trial jury would likely never have heard that she had previously identified Gueits as the Victim's assailant. Arguably, the colloquy following the end of Jagpal's testimony, in which the court explained its basis for allowing the impeachment pursuant to Crim. Proc. Law § 60.35, *see* TT 478–80, suggests that any shortcoming in Maltz's performance was harmless because the court would have allowed the impeachment even if Maltz had made the correct legal argument. That is not my view. The court's analysis was unquestionably incon-

---

62. A critical premise for the defense theory that Maltz undermined by failing to pursue the DNA evidence was that the Victim was, in fact, raped as well as beaten. Until I read the respondent's opposition to the instant petition, I took it for granted that the parties were in agreement as to the accuracy of that premise. I was therefore surprised to see the respondent take issue with that proposition in his brief, *see* Opp. 41 ("there was no evidence at all that [the Victim] actually was raped"), and even more surprised at the way his counsel sought to support that assertion at oral argument. Specifically, counsel argued that the Victim's contemporaneous statements about having been "raped" were somehow, as counsel put it, "equivocal." AT 43. Counsel went on to surmise that the DNA found in the Victim's vagina and anus on the evening she was brutally beaten—DNA that matched the sample taken from another rape victim in Maryland—might have been deposited as a result of consensual sexual intercourse with the African-American semen donor rather than rape, notwithstanding the fact that the State had until then consistently taken the position that the Victim had been raped. *Compare* AT 43–44, 59 (argument by respon-

dent's counsel), *with* TT 571 (Victim's testimony about being "raped"); *and* TT 578 (Victim's testimony that she did not socialize with any African–American male on the night she was attacked); *and* TT 405 (testimony of EMT Sawyer confirming that the Victim said that "the person who raped her also beat her"); *and* TT 742–43 (prosecutor's suggestion in summation that Gueits's DNA was not found in the Victim only because he did not ejaculate, an argument that necessarily assumed the Victim was raped); *and* PX 7 (Officer Burrell's complaint report, recounting that "Victim stated that Perp assaulted he[r] and . . . that she was also raped by Perp") (capitalization removed).

The Victim's claim that she was "raped"—made repeatedly on the day of the crime and again at Gueits's trial, supported by other evidence before the jury, and unhesitatingly adopted by the trial prosecutor—cannot in any fair way be described as "equivocal." The respondent's belated attempt to characterize it as such can only be understood as a breathtakingly cynical attempt to evade the conclusion that Maltz's failure to collect and present the DNA evidence was prejudicial.

sistent with controlling case law interpreting the relevant statute: contrary to the court's reasoning, the fact that a witness's testimony tends to disprove what she said in the grand jury, or to disprove the prosecutor's prediction of the testimony in his opening statement, is not a reason to allow impeachment. Instead, as noted above, the prerequisite for such impeachment is a tendency of the trial testimony to disprove the party's substantive position—in this case, its accusation that Gueits committed the assault. *See* note 23 *supra* (citing cases).

The trial judge should have known that law, and so too should Maltz. Had Maltz made the right argument, he might well have persuaded the judge. Instead, he repeatedly and insistently made precisely the wrong arguments, even after the judge noted that he was not addressing the issues relevant to the statute under debate. It is of course possible that the trial judge would have adhered to his faulty analysis even if one of the attorneys before him had made the right argument and cited controlling precedent. But there is at a minimum a reasonable probability that a neutral judge with no interest in the outcome would, with the benefit of controlling law, have made the right call—and there can be no question that the right call would have dramatically changed the posture of the trial and its likely outcome.

The remaining proof would have been weak at best, as highlighted by the extensive use that the prosecutor made of the impeachment testimony in his summation. Without Jagpal's grand jury testimony, the prosecution's effort to prove that Gueits was the man who committed the charged assault would have rested on three pieces of circumstantial evidence: the Victim's blood on Gueits's sneaker, Burrell's testimony about the Victim's head-shake in response to the show-up procedure, and

the consciousness of guilt that the prosecutor asked the jury to infer from Gueits's supposedly false exculpatory statement to the police. Considered singly or together, none of that evidence provides any confidence in the trial's outcome. The fact that the Victim's blood was found on Gueits's sneaker was of course entirely consistent with his statement to the police. Burrell's account about the Victim's inherently equivocal response, made while she was drifting in and out of consciousness, was such weak proof that the prosecutor never referred to it on summation; among other problems, it was inconsistent with the Victim's own trial testimony that she *was* able to recall the man she had identified to Burrell as her assailant and yet did not see him in the courtroom. *See* TT 572.

Finally, leaving aside the fact that the jury was deprived of the DNA evidence that undermined the characterization of Gueits's exculpatory statement as false, the case law is clear that a false exculpatory statement is not enough, either by itself or supported only by weak affirmative proof of guilt, to sustain a conviction.

> [W]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force, ... falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the [prosecution's] theory of guilt.

*United States v. Lorenzo,* 534 F.3d 153, 160–61 (2d Cir.2008) (quoting *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975)). On this record, I do not hesitate in concluding that but for Maltz's unreasonable performance in failing to

make the proper objection to the admission of Jagpal's grand jury testimony, there is a reasonable probability that the outcome at trial would have been different.

### c. *The Improper Use Of Jagpal's Impeachment As Evidence–In–Chief*

■ In assessing Gueits's third sub-claim of ineffectiveness—and only that sub-claim—against the prejudice prong of the *Strickland* test, I assume that Jagpal's grand jury testimony would have been admitted as impeachment, and that the only relevant question at this stage is whether limiting it to such use would have affected the outcome. I conclude that it would have. In doing so, I am again swayed in part by the prosecutor's own argument—which relied heavily on Jagpal's grand jury statements as affirmative proof of Gueits's guilt. *See* TT 731–38, 745. If Maltz had sought to ensure the proper limitation on the use of the impeachment—by requesting a limiting charge when it was introduced, by objecting to (rather than approving) erroneous language in the final jury charge, and by objecting to the prosecutor's improper reliance on it during the summation and requesting a curative instruction—the jury would have known that whatever use it could make of Jagpal's grand jury testimony for purposes of assessing her credibility, it could not rely on those statements in any way as affirmative proof that Gueits had committed the charged assault. Seen in that light, it is clear that the prejudice arising from Maltz's error in this regard is precisely the same as the prejudice arising from his failure to prevent the admission of the

impeachment in the first place; and for the reasons set forth above, I conclude that such prejudice satisfies the *Strickland* test's second element.

The respondent argues otherwise. In doing so, he relies on an unpublished district court decision, together with the latter opinion's internal citation to a case that predates *Strickland,* as authority for the proposition that "the failure to object to the introduction of impeachment evidence as evidence in chief does not constitute ineffectiveness." Opp. at 54 (citing *Sanchez v. Herbert,* No. 02–CV–2038 (ERK), slip op. at 9 (E.D.N.Y. Mar. 20, 2003) (citing *United States v. DeSisto,* 329 F.2d 929, 933 (2d Cir.1964))). The fact that the respondent cannot find any stronger authority for its argument is telling: the lesson the respondent would have the court draw from his authority is simply wrong.[63] The court in *Sanchez* considered a habeas petitioner's ineffectiveness claim based in part on the fact that his trial counsel permitted the state to impeach its own witness and then failed to ask for a limiting instruction on the use of a prior inconsistent statement under New York law. The court rejected the claim for two reasons:

> First, a party may impeach its own witness. Second, *except where the prior statement is essential to establish a prima facie case,* there is little practical difference between admission for impeachment and admission as evidence in chief. *See United States v. DeSisto,* 329 F.2d 929, 933 (2d Cir.1964) ("The rule

---

**63.** Arguably, the court should not even consider *Sanchez.* It is an unpublished district court decision (and one that is not even available in electronic form on the court's automated docketing system, having been decided prior to the issuance of this court's Administrative Order 2004–08), and the respondent did not bother to provide a copy to the court along with his submission. Having taken the trouble to retrieve the decision from the Clerk's closed files, and having seen how blatantly the respondent has misinterpreted it, I conclude the better course is to overlook the procedural impropriety and address it on the merits.

limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as a 'pious fraud,' 'artificial,' 'basically misguided,' [and] 'mere verbal ritual.'"). Thus *the petitioner's failure to seek an instruction of theoretical utility that the jury could not consider Montalvo's prior inconsistent statement as evidence-in-chief made no difference to the outcome of the trial. Indeed, her prior statements were helpful to the petitioner,* so that it is unclear why counsel would have wanted such an instruction. *Id.* at 9–10 (emphasis added). The case is plainly of no help to the respondent here. The first rationale for the decision simply does not apply—under the New York law applicable during Gueits's trial, the prosecution was *not* free to impeach its own witness. More fundamentally, the second rationale assumes that the impeachment statement was not directly probative of the petitioner's guilt—a fact that does not obtain here.

It would be entirely inconsistent with *Strickland* to adopt a rule that the failure to object to the introduction of impeachment evidence as evidence-in-chief can never constitute ineffectiveness for purposes of the Sixth Amendment—and neither *Sanchez* nor *DeSisto* purported to do so. If the failure to object is an unreasonable error, and if there is a reasonable probability that such a lapse affected the outcome, then it is a denial of the Sixth Amendment right to counsel. There may well be instances in which insistence on the distinction between impeachment and evidence-in-chief can require a form of "mental gymnastics of which jurors are happily incapable," *DeSisto*, 329 F.2d at 933, but this case is clearly not one of them. If the

jurors had been told that Jagpal's impeachment could properly be used only to impeach her denial of the ability to identify the Victim's assailant, but that they could not use it as proof that she had seen Gueits commit the assault, then the remaining proof would have been so thin that there is at least a reasonable probability that the outcome at trial would have been different.

### d. The Cumulative Effect Of Counsel's Errors

As explained above, I conclude that each of the errors by trial counsel raised in the first three sub-claims of Gueits's petition, viewed in isolation, was sufficiently prejudicial to warrant relief under *Strickland.* The case law, however, requires that the court consider the cumulative effect of all those errors. *Harris,* 288 F.Supp.2d at 256 (quoting *Lindstadt,* 239 F.3d at 202). Viewed in that light, I conclude that the prejudicial effect of Maltz's errors is inescapable. Leaving aside the many other ways in which Maltz's performance as Gueits's trial counsel can reasonably be criticized, a trial in which Gueits's defender avoided the three errors discussed above would have looked vastly different. The jury would have heard *no* testimony identifying Gueits as the Victim's assailant. It would have learned that Gueits's exculpatory statement about seeing a black man attack the Victim was corroborated by evidence showing that her attacker's DNA matched the DNA recovered from a rape victim who identified her assailant as a black man. Combined with the evidence that the Victim had stated that the man who committed the assault at issue had also raped her, such evidence would have devastated the prosecution's remaining proof.[64] *Strickland* requires only a rea-

---

**64.** Moreover, even the most inculpatory portion of *that* proof came before the jury as the

result of Maltz's error, albeit not one at issue in the instant petition. As noted earlier,

sonable probability that a defendant would not have been convicted but for his trial counsel's errors; but the cumulative effect of the errors at issue here is so great that Gueits would be entitled to relief under any standard of assessing prejudice. Indeed, I can scarcely imagine that a rational jury would have convicted Gueits on the evidence that would have been before it if Gueits had been represented by constitutionally effective counsel.

## C. The State Court's Rejection Of The Ineffectiveness Claim Was Unreasonable

 If the court agrees that Gueits satisfied both elements of the test for ineffectiveness claims announced in *Strickland*, it must finally consider whether the state court decisions that denied Gueits relief on his ineffectiveness claim were contrary to, or an unreasonable application of, that Supreme Court decision. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 390, 120 S.Ct. 1495; *Cox v. Donnelly*, 387 F.3d 193, 197 (2d Cir.2004) (citing *Aparicio v. Artuz*, 269 F.3d 78, 94–95 (2d Cir. 2001)); *Lindstadt*, 239 F.3d at 198; *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000). A state court decision is "contrary to" established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. An "unrea-

sonable application" of Supreme Court law "occurs if the state court identifies the correct rule of law but applies that principle to the facts of the petitioner's case in an unreasonable way." *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir.2006) (citing *Williams*, 529 U.S. at 413, 120 S.Ct. 1495). In the specific context of a habeas petitioner's claim that he was denied the effective assistance of counsel, the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

 The deference to state decisions required under federal habeas law requires more than just a disagreement as to the result. "For a state court to unreasonably apply clearly established federal law, it is not enough that a federal court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Eze*, 321 F.3d at 125 (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495) (quotation marks omitted). Instead, "some increment beyond error is required." *Id.* (quoting *Francis S.*, 221 F.3d at 111 (internal quotation marks omitted)). However, such incremental error "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal quotation marks and citations omitted).

---

Maltz did not make the correct argument as to why the record neither permitted Burrell to testify as to the show-up procedure at which the Victim had shaken her head in response to seeing Gueits, nor permitted the prosecutor to recall the Victim to lay a foundation for such testimony. Had Maltz correctly pointed out that the Victim had unequivocally testified to an ability to recall the man she had identi-

fied to Burrell, *see* TT 572, New York statutory law would have precluded Burrell's testimony. *See* N.Y.Crim. Proc. Law § 60.25. Without that testimony, the entirety of the prosecution's case would have been completely consistent with the account that Gueits gave the police—an account later partially corroborated by DNA analysis.

In this case, there is no reasoning or analysis to which the court can defer, or at least none in the record—there is only a conclusion by the state courts that Gueits was not deprived of his right to the effective assistance of counsel. When "a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on its merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Eze*, 321 F.3d at 125 (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311–12 (2d Cir.2001)); *see also Serrano v. Fischer*, 412 F.3d 292, 297 (2d Cir.2005) (noting that where a state court summarily rejects a claim on the merits without explanation, a federal habeas court must focus on the state court's ultimate decision, rather than its reasoning).[65]

■ As discussed above, the Appellate Division rejected Gueits's ineffectiveness claim on the ground that he received "meaningful representation." *People v. Gueits*, 10 A.D.3d 732, 781 N.Y.S.2d 916, 916 (App.Div.2004). Under New York's "meaningful representation" standard, "[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met." *People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981); *see also People v. Henry*, 95 N.Y.2d 563, 721 N.Y.S.2d 577, 744 N.E.2d 112 (2000).

Gueits argues that the court's invocation of the *Baldi* "meaningful representation" standard, standing alone, is sufficiently inconsistent with *Strickland* to constitute "a decision that [is] contrary to, or ... an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" for purposes of 28 U.S.C. § 2254(d)(1). *See* Petition at 100–01. In support of this argument, Gueits cites a recent appellate opinion raising just that possibility. *See Henry v. Poole*, 409 F.3d at 70–71 (questioning, but not deciding, "whether the New York standard is not contrary to *Strickland*"). Rather than resolve that question, I respectfully recommend that the court follow the example set in *Henry v. Poole* and decide the case on narrower grounds. Gueits had the benefit of a committed and experienced trial attorney who defended his client in many appropriate ways that would have been beyond Gueits's own ability. I must therefore conclude that Gueits had representation that was "meaningful" under any commonsense interpretation of the term—just as I must in fairness agree with the trial judge who concluded that Maltz "did [his] best for [his] client." ST 15.

However spirited and "meaningful" Maltz's representation of Gueits may have

---

**65.** The latter rule applies here because the state court decisions from which Gueits seeks habeas relief "dispose[d] of the petitioner's federal claim on substantive grounds, and reduce[d] that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Eze*, 321 F.3d at 112 (quoting *Aparicio*, 269 F.3d at 93–94); *see also Howard v. Walker*, 406 F.3d 114, 122 (2d Cir.2005) ("A state court adjudicates a petitioner's federal claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.") (quoting *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir.2002)). Specifically, Gueits alerted the Appellate Division to the federal nature of his claim of ineffective assistance of counsel by citing both the Sixth Amendment to the U.S. Constitution and federal case law in his appellate brief. App. Div. Br. at 63–64. The Appellate Division disposed of the claim on substantive grounds and reduced its disposition to judgment. *People v. Gueits*, 10 A.D.3d 732, 781 N.Y.S.2d 916 (App.Div.2004).

been, it was also unreasonably deficient in several critical respects, and there is a reasonable probability that those lapses had a dispositive effect on the jury's verdict. It may therefore be the case that the instant petition highlights a disconnect between the *Baldi* standard and the *Strickland* standard that renders the former an inherently unreasonable application of clearly stated Supreme Court case law that the state courts would do well to abandon. This court need not, and in my view should not, reach any such sweeping conclusion. Whether or not the *Baldi* standard is irreconcilable with *Strickland*, I conclude for the reasons explained below that the state courts' conclusory rejection of Gueits's Sixth Amendment claim on the record that Gueits presented was an unreasonable application of established Supreme Court case law. That conclusion, if adopted by the court, suffices to resolve this case.

The record developed at the *Sparman* hearing plainly demonstrated that the lapses of which Gueits complains were not strategic decisions on the part of his trial counsel but rather the result of inattention and error. The state courts that rejected Gueits's ineffectiveness claims did not have the benefit of that record, but they did not need it to see that there cannot have been any reasonable strategic decision-making involved. With respect to the DNA evidence, it was clear that Maltz had made a strategic decision to try to prove the connection to the Maryland case—and it was just as clear that the only effort he made in that regard was to ask his opponent for a stipulation. There is no way to view the reliance on the hope of a stipulation—to the exclusion of all other efforts in case the prosecutor refuses to stipulate—as a reasonable strategic choice. There is similarly no objective way to view Maltz's failure to make the *correct* legal argument to preclude the admission of Jagpal's im-

peachment as a strategic decision, given the fact that he made every conceivable *incorrect* argument on the matter. Finally, there is no objective way to view the failure to seek a proper limitation of impeachment as a strategic choice by defense counsel; there was nothing to be gained by letting the jury consider Jagpal's grand jury testimony identifying Gueits as the assailant as affirmative proof, and much to be lost. I therefore conclude that if the state courts' rejected Gueits's ineffectiveness claim under the first prong of the *Strickland* test, they unreasonably applied that Supreme Court decision. *See Loliscio v. Goord*, 263 F.3d 178, 195 (2d Cir.2001) ("We find . . . that trial counsel's performance was objectively unreasonable, and thus that the state court's determination to the contrary constituted an unreasonable application of the first prong of Strickland.").

I reach the same conclusion with respect to the state courts' application of the second part of the *Strickland* test relating to prejudice. Each of the errors by trial counsel at issue here related to one of the two critical building-blocks of the prosecution's case: Jagpal's grand jury testimony identifying Gueits as the man she saw kicking the Victim; and the prosecutor's ability—by virtue of the absence of the DNA evidence relating to the Maryland rape case—to portray Gueits's exculpatory statement about having seen a black man commit the assault as a falsehood that showed his consciousness of guilt. Taken together, those two matters accounted for virtually every part of the trial record that the prosecutor mentioned in his summation (aside from description of the Victim's injuries, which had no bearing on whether Gueits was the one who caused them). Take one of those building-blocks away and the State's case would have been wobbly at best; remove both and the prosecu-

tion would likely have crashed to the ground. Reasonable minds can differ about what the verdict would actually have been but for Maltz's errors, particularly if viewed in isolation, but I conclude that upon measuring those errors against the *Strickland* standard—which requires only a reasonable probability of a different outcome in their absence—it was objectively unreasonable to deny relief to Gueits on his Sixth Amendment claim. *See, e.g., Henry v. Poole*, 409 F.3d at 71 ("a decision may constitute an objectively unreasonable application of federal law even if, as to the reasonableness of application, some reasonable jurists would reach a contrary conclusion") (citing *Williams v. Taylor*, 529 U.S. at 409, 120 S.Ct. 1495). Simply put, it is objectively unreasonable to have "confidence in the outcome[,]" *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, of a trial in which the evidence properly admitted was so thin and the errors of trial counsel so pervasive and so essential to the evidence on which the prosecutor asked the jury to rely.

### III. *Recommendations*

Gueits may well have committed or been complicit in the assault with which he was charged; at best, he was by his own account unwilling to help the Victim of that assault when she was in desperate need of his aid. Whatever the truth, it is clear that he was convicted of the crime and is now imprisoned as the result of the denial of his constitutional right to counsel. The prosecution in this case was marred by a cynical approach that produced an unreliable conviction and that ignored strong evidence that another man may have committed both the assault for which Gueits is now in prison as well as the rape that has gone unpunished. The result is unfair not only to Gueits, but also to the Victim whose rapist apparently remains at large and to the public. The respondent's indifference to this obvious injustice is nothing short of astonishing.

For the reasons set forth above, I respectfully recommend that the court grant the pending petition for a writ of habeas corpus and order the State of New York either to retry Gueits within 45 days of the court's order or to release him.

### IV. *Objections*

Any objection to this Report and Recommendation must be filed no later than August 25, 2008, absent an order extending that deadline. Failure to file timely objections waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker*, 118 F.3d 900 (2d Cir.1997); *Savoie v. Merchs. Bank*, 84 F.3d 52 (2d Cir.1996).

**SO ORDERED.**

August 8, 2008